# EXHIBIT "A"
# (1 of 3)

## Page 1

```
         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION

MOSES PEREZ and DEE PEREZ, ) Case No. 1:17-cv-02610
                          )
        Plaintiffs,       )
                          )
   vs.                    ) DEPOSITION TAKEN ON
                          ) BEHALF OF PLAINTIFF
K & B TRANSPORTATION,     )
INC., and KIARA WHARTON,  )
                          )
        Defendants.       )


DEPOSITION OF:  KIARA WHARTON
DATE:  March 23, 2018
TIME:  8:55 a.m.
PLACE: Delta Marriott/Marina
       385 East 4th Street
       South Sioux City, NE 68776
```

*Angela M. Ickler, RPR*
Latimer Reporting * 402-476-1153 * latimer@latimer-reporting.com

## Page 2

```
                    A-P-P-E-A-R-A-N-C-E-S

APPEARING FOR PLAINTIFFS:

     Ms. Hadas M. Benhamou
     Attorney at Law
     1 East Wacker Drive
     Suite 510
     Chicago, IL 60601
     hcorey@coganpower.com

APPEARING FOR DEFENDANTS:

     Ms. Lamis G. Eli
     Attorney at Law
     55 West Monroe Street
     Suite 3800
     Chicago, IL 60603
     Lamis.eli@wilsonelser.com

ALSO PRESENT:

     Mr. Matt Tipton, K & B Representative
```

## Page 3

```
                       I-N-D-E-X
WITNESS:            DIRECT  CROSS  REDIRECT  RECROSS
Kiara Wharton         4      132     185       191

EXHIBITS:                           MARKED   OFFERED
1.  392.14 Hazardous
    conditions; extreme
    caution                          53        --
2.  Drawing                         145        --
3.  Illinois Traffic
    Crash Report                    151        --
4.  Google Maps                     151        --
5.  Phone records                   185        --
```

## Page 4

KIARA WHARTON,
Of lawful age, being first duly cautioned and solemnly sworn as hereinafter certified, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MS. BENHAMOU:

Q. Will you, please, state your first and spell your last name for the record?

A. It is Kiara. Last name, W-H-A-R-T-O-N.

Q. And, Kiara, do you prefer that I call you Ms. Wharton or by your first name?

A. It doesn't matter.

Q. Okay. Then I will call you Ms. Wharton. As you already know, I have been retained by the plaintiffs, Moses and Dee Perez, to represent them for personal injuries they sustained on January 20, 2016, in the state of Illinois after an accident that you were aware of. Before we get started, let me state for the record that this deposition will be taken pursuant to notice and agreement by both parties. The deposition will be pursuant to the federal rules of civil procedure and for the Perez case that is currently pending in the United States District Court for the Northern

1  District of Illinois.
2        Ms. Wharton, since this is the first
3  time you and I are meeting, I would just on the
4  record reserve my right to re-depose you
5  limited in scope to anything new that we
6  discover exists, maybe in terms of a document
7  or record, that I haven't been aware of
8  previously, okay?
9  A.    Okay.
10 Q.    All right.  Since you sat through the
11 deposition yesterday, you know the ground
12 rules, correct?
13 A.    Yes.
14 Q.    Have you ever been deposed before?
15 A.    No.
16 Q.    Okay.  So let me state, if you do not
17 understand my question, it is probably my bad.
18 Please ask me to clarify, and I will.  If you
19 do offer an answer, I will assume that meant
20 you understand my question, okay?
21 A.    Okay.
22 Q.    As you know, all answers have to be
23 verbal, okay?
24 A.    Yes.
25 Q.    If you don't know an answer, an "I don't


1  know" is a perfectly acceptable answer, but if
2  I ask you a question like, "What is your date
3  of birth," and you say, "I don't know," then we
4  are going to have a harder time, okay?
5  A.    Yes.
6  Q.    All right.  And then this is the only
7  chance that I get to talk to you, so will you
8  please agree to give me full and complete
9  answers to my questions to the best of your
10 ability?
11 A.    Okay.
12 Q.    Can we also agree that when I say FMCSR,
13 I mean the *Federal Motor Carrier Safety
14 Regulations*, and when I say "wreck" or
15 "collision," I mean the incident of January 20,
16 2016?
17 A.    Okay.
18 Q.    Sound fair?
19 A.    Yes.
20 Q.    Okay.  Ms. Wharton, isn't it true that
21 at the time of the wreck, you were hauling a
22 critical customer's load to Meijer in Newport,
23 Michigan?
24 A.    I was hauling a meat load.
25 Q.    A Tyson load, correct?


1  A.    Yes.
2  Q.    And your destination was Meijer in
3  Newport, Michigan; is that correct?
4  A.    After I left my first one, yes.
5  Q.    Okay.  And on the day in question, I
6  believe you started in Waterloo, Iowa, correct?
7  A.    Right.
8  Q.    And then you had one stop in Urbana,
9  Illinois, correct?
10 A.    Right.
11 Q.    And then from Urbana, Illinois, you were
12 supposed to proceed to Newport, Michigan, sound
13 correct?
14 A.    Yes.
15 Q.    And do you agree with me that Meijer is
16 a critical customer per the K & B rules and
17 regulations?
18 A.    Yeah.
19 Q.    And can we further agree that your
20 failure to timely deliver the Tyson Foods'
21 products to Meijer in Newport, Michigan, would
22 result in your, quote, gross misconduct
23 discharge, meaning that you would be fired and
24 you would be ineligible for unemployment?
25       MS. ELI:  I'm going to object to


1  that characterization, and the foundation of
2  that as she is not in a position to fire
3  herself.
4  Q.    (By Ms. Benhamou) Okay.  Do you
5  understand my question?
6  A.    It was a little --
7  Q.    I can break it up.
8  A.    Yeah.
9  Q.    Sure.  Are you familiar with the K & B
10 policies concerning critical customers?
11 A.    Meaning that we must deliver on time?
12 Q.    Correct?
13 A.    Yes.
14 Q.    And do you know what the penalties are
15 for failure to timely deliver to a critical
16 customer?
17 A.    That's never been discussed with me.
18 Q.    No?
19 A.    I always deliver on time.
20 Q.    No, understood.  Understood.  But in the
21 K & B training, there was a policy that you
22 received about the two-strike rule and about
23 critical customers?
24 A.    It's been awhile so I really don't
25 remember.



## Page 9

1  Q. That's fine. Then let me refresh your
2  recollection. This is Bates stamped Perez
3  K&B128, and you can ignore my scribbles at the
4  bottom.
5      MS. BENHAMOU: Lamis, do you
6  want to see it first? I'm sorry.
7      MS. ELI: That's fine.
8  Q. (By Ms. Benhamou) You can ignore my
9  scribbles at the bottom in blue, but would you
10 agree that at the bottom of the page your
11 signature appears?
12 A. Yes.
13 Q. And do you recall seeing this document?
14 A. Yeah. I don't really remember it being
15 a two strike, if you are late, you get fired
16 automatically type of thing.
17 Q. You would agree with me that it is
18 important to read anything before signing it,
19 correct?
20 A. Uh-huh.
21 Q. Yes?
22 A. Yes.
23 Q. And so at some point, whether it was
24 yesterday or two years ago, you read this
25 document, correct?

## Page 10

1  A. Right.
2  Q. Okay. And when you read it before you
3  signed it, you understood the terms, correct?
4  A. Right.
5  Q. Okay. And then since you read it and
6  signed, are you telling me that you haven't
7  been refreshed on the two-strike rule?
8  A. Yeah, I would say so. Seeing as I have
9  not delivered anything late, I've not had to go
10 through it again or have somebody reprimand me
11 about it.
12 Q. Understand completely. Understood. So
13 then if you don't mind, could you read into the
14 record the list of critical customers on Page
15 128?
16 A. Walmart Stores and Warehouses, Aldi's,
17 Meijer Stores, Safeway Stores, Save-a-lot
18 Stores --
19 Q. Slow down a little bit, sorry.
20 A. Kroeger Stores.
21 Q. Thank you.
22 A. Super Value Stores and any Military
23 deliver point.
24 Q. Thank you so much. And then would you
25 also, please, read the start of this last

## Page 11

1  sentence of the one, two, third paragraph on
2  the page.
3  A. This here (indicating)?
4  Q. Correct.
5  A. The above-listed critical customers will
6  count double; hence any lates for these
7  specific customers will result in a gross
8  misconduct discharge. Keep in mind that
9  misconduct -- misconduct discharges reflect
10 poorly on your DAC/USIS driver database info,
11 and you are ineligible for unemployment.
12 Q. Okay. Thank you.
13     All right. Ms. Wharton, did you review
14 anything in anticipation for your deposition
15 today?
16 A. Other than going over questions, not
17 really, no.
18 Q. So I do not want to know about any
19 conversations that you had with Lamis. Those
20 are privileged.
21 A. Okay.
22 Q. I am just wondering if you looked at any
23 documents, like written discovery or the
24 depositions of the plaintiffs?
25 A. Other than what I discussed with her,

## Page 12

1  no.
2  Q. Okay. So only oral communications,
3  correct?
4  A. Right.
5  Q. How much time in total do you think you
6  spent preparing for today?
7  A. You mean looking at paperwork or just
8  discussing it with?
9  Q. Well, did you look at paperwork?
10 A. No. I just verbally, we just sat and we
11 talked about an hour.
12 Q. About an hour?
13 A. Yeah.
14 Q. Okay. Since the wreck, have you gone
15 back to the scene of the accident?
16 A. Many times.
17 Q. Okay. You've driven through that way?
18 A. Many times.
19 Q. And in going back, have you ever done an
20 accident reconstruction of the January 20,
21 2016, incident?
22 A. You mean replanned it in my head?
23 Q. No. I mean, gone back with any
24 professional accident reconstructionist?
25 A. Oh, no.

## Page 13

1 Q. Have you gone back over it in your head?
2 A. Many times.
3 Q. Okay. And we will get to that in a
4 minute so thank you. Please tell me your date
5 of birth?
6 A. 11/06/1989.
7 Q. Does that make you 27 in January of
8 2016?
9 A. Probably, yeah.
10 Q. Okay. I have a November birthday, too.
11 Can I have the last four digits of your
12 social security number?
13 A. 5960.
14 Q. Okay. Are you currently on any
15 medication?
16 A. No.
17 Q. Were you on January 20th --
18 A. No.
19 Q. -- 2016? So fair to say, you are not on
20 any medications which would prohibit you from
21 testifying competently today?
22 A. Correct.
23 Q. Have you ever been diagnosed with sleep
24 apnea?
25 A. No.

## Page 14

1 Q. Diabetes?
2 A. No.
3 Q. Hyperglycemia?
4 A. No.
5 Q. Heart problems?
6 A. No.
7 Q. Any other health problems?
8 A. No.
9 Q. Okay. Can I please have the name of
10 your family doctor if you have one?
11 A. Don't have one.
12 Q. Have you ever seen any specialist, like
13 a cardiologist?
14 A. No.
15 Q. Where do you currently reside?
16 A. I have a P.O. box.
17 Q. Okay. And what is your P.O. box
18 address?
19 A. 1530 PB Lane -- for the box number, it
20 is hash tag W3730, Wichita Falls, Texas 76302.
21 Q. And for how long have you had this P.O.
22 box?
23 A. For about a year now.
24 Q. Okay. So it is March of 2018, since
25 about early 2017?

## Page 15

1 A. Uh-huh.
2 Q. Yes?
3 A. Yes.
4 Q. And prior to the P.O. box, where were
5 you living? Well, strike that actually.
6 When you are off duty, where do you go?
7 A. Now or then?
8 Q. Currently.
9 A. Wherever. If I want to visit my sister,
10 I go stay with her, and if I'm just wherever I
11 am and I want to take a break, I say stop where
12 I am, and I'll go get a hotel room.
13 Q. And where does your sister reside?
14 A. Lubbock, Texas.
15 Q. Okay. How long has she lived in
16 Lubbock, Texas?
17 A. She has lived there for, I don't know,
18 two almost three years, close to that.
19 Q. And your sister's name?
20 A. Jasmine Bates (spelled phonetically).
21 Q. And does your sister live at that
22 residence with anybody else?
23 A. I don't think so.
24 Q. Where would you consider yourself born
25 and raised?

## Page 16

1 A. Indianapolis, Indiana.
2 Q. And until what age did you continue to
3 reside in Indiana?
4 A. I think I was 23.
5 Q. And once you hit 23, where did you go?
6 A. Charleston, South Carolina.
7 Q. Yeah, I noticed that you lived in a few
8 really cool places. So you -- I saw
9 Charleston, South Carolina, and then after
10 Charleston, where were you?
11 A. Then I was -- it was close to Denver,
12 Colorado. I don't really remember. I was
13 there for a few weeks before I went to truck
14 driving school.
15 Q. Okay. So you did truck driving school
16 in Denver?
17 A. No, in Utah. Salt Lake City, Utah.
18 Q. And who was the school through?
19 A. Central Refrigerated now Swift.
20 Q. Understood. How long was that course?
21 A. I think it was close to three weeks.
22 Q. And were there tests you had to pass?
23 A. Yeah. There was a question test, and
24 then there were actual driving tests. For the
25 license part, I had to go to the DMV for --

Page 17

```
 1  there was a license before you get your
 2  driver's license.
 3  Q.    Before you get your CDL, you get your
 4  CDL permit, right?
 5  A.    Permit, yeah.
 6  Q.    Okay, cool. Did you pass all of those
 7  tests on the first try?
 8  A.    No.
 9  Q.    Which one did you not pass on the first
10  time?
11  A.    I got my permit. Did that on the first
12  try, and then every, there was like three
13  different sections to get my actual CDL. I
14  failed the pre-trip part, then I passed it.
15  And then I failed the backing part, and then I
16  passed it, and then I passed my driving part.
17  Q.    Got it. I actually tried to do a few
18  online, and they are not that easy. So at what
19  age did you first obtain your regular driver's
20  license --
21  A.    Eighteen.
22  Q.    -- 16? Eighteen. And was that issued
23  in the state of Indiana?
24  A.    Yes.
25  Q.    And then did you get a South Carolina
```


Page 18

```
 1  license after that?
 2  A.    Yes.
 3  Q.    Okay. And around what date did you get
 4  a South Carolina license, if you know?
 5  A.    I don't.
 6  Q.    Okay. Did you have a license in
 7  Colorado as well?
 8  A.    I had two. I had to surrender my South
 9  Carolina driver's license for Utah.
10  Q.    And I'm sorry, for Utah, did you get a
11  Utah license, too?
12  A.    The permit for the CDL.
13  Q.    Got it. So your first CDL was issued by
14  the state of Utah?
15  A.    Uh-huh.
16              THE COURT REPORTER: Yes?
17              THE WITNESS: Yes. Sorry.
18  Q.    (By Ms. Benhamou) And you know that you
19  are not federally permitted to have multiple
20  licenses from separate states at the same time,
21  correct?
22  A.    Yes.
23  Q.    Okay. And so there was no overlap,
24  correct?
25  A.    No.
```


Page 19

```
 1  Q.    So your Indiana license had expired when
 2  you got your Charleston license, correct?
 3  A.    I surrendered it.
 4  Q.    Oh, you surrender Indiana, too?
 5  A.    You have to.
 6  Q.    And are you allowed to have a CDL as
 7  well as a regular license at the same time?
 8  A.    They count as the same thing.
 9  Q.    Okay. Please provide me with your cell
10  phone number?
11  A.    317-332-3563.
12  Q.    And in 2016 was that the same number?
13  A.    Yes.
14  Q.    Did you have two cell phones in 2016?
15  A.    No, not really.
16  Q.    What do you mean "not really"?
17  A.    I pay for my sister's cell phone under
18  my account.
19  Q.    Got it. And that is Jasmine?
20  A.    Right.
21  Q.    Okay. And that account was with Team
22  Mobile, correct?
23  A.    Right.
24  Q.    Do you still have Team Mobile?
25  A.    Yes.
```


Page 20

```
 1  Q.    Can you, please, provide me with your
 2  current email address?
 3  A.    Kmwharton@gmail.com.
 4  Q.    And was that your email in 2016?
 5  A.    Yes.
 6  Q.    Any other email addresses you would use
 7  in 2016?
 8  A.    No, but I do have a Yahoo that I
 9  actually never use.
10  Q.    Probably don't even remember the
11  password?
12  A.    No.
13  Q.    Do you have a K & B email address?
14  A.    I don't think so.
15  Q.    Please don't take offense, have you ever
16  pled guilty or been convicted of a crime
17  involving dishonesty or fraud?
18  A.    No.
19  Q.    What kind of license do you currently
20  carry?
21  A.    A CDL A.
22  Q.    And what does the "A" designation
23  signify?
24  A.    I have no clue. I just know it allows
25  me to drive, I think anything. A combination
```



Page 21

```
 1  -- no, I think it just lets me drive semis.
 2   Q.    Semis.  Instead of like pallet jack,
 3  specialty trucks, or something?
 4   A.    Yeah, that is something else.
 5   Q.    Okay.  And the CDL that you currently
 6  carry is issued by which state?
 7   A.    Texas.
 8   Q.    Do you have it on you?
 9   A.    Yes.
10   Q.    Can I see it, please?  You can produce
11  it to your counsel first.
12   A.    (Witness complies.)
13         MS. BENHAMOU:  Any objections to
14  me reading the number into the record?
15         MS. ELI:  Yeah.  Let's do that
16  off the record.
17         MS. BENHAMOU:  Off the record
18  then.
19              (An off-the-record discussion
20              took place at this time.)
21         MS. BENHAMOU:  Back on the
22  record, please.
23   Q.    (By Ms. Benhamou) You know what, I
24  didn't look, but you are currently wearing
25  glasses, correct?
```

Page 22

```
 1   A.    Uh-huh.
 2   Q.    Yes?
 3   A.    Yes.
 4   Q.    And at what age did you first require
 5  glasses?
 6         MS. ELI:  You can look at her
 7  license again if you didn't note that.
 8         MS. BENHAMOU:  I didn't note
 9  that, but it is fine, since we were off the
10  record, I don't care.
11   Q.    (By Ms. Benhamou) Does your license
12  contain a restriction for your eyes?
13   A.    Yes.
14   Q.    Do you wear your glasses at all times
15  when you are driving?
16   A.    Yes.
17   Q.    Do you ever wear contacts?
18   A.    No.
19   Q.    Have you ever had Lasik eye surgery?
20   A.    No.
21   Q.    Back to the question about the age you
22  started wearing glasses?
23   A.    Middle school probably.
24   Q.    So safe to say you required glasses in
25  January of 2016?
```

Page 23

```
 1   A.    Yeah.
 2   Q.    When is the last time you saw an eye
 3  doctor?
 4   A.    November of this year.
 5   Q.    2017?
 6   A.    '17, yep.
 7   Q.    And are your eye exams always regular?
 8   A.    (The witness shook her head in the
 9  negative.)
10   Q.    No?
11   A.    No.
12   Q.    Any problems that have come up within
13  the last five years?
14   A.    No.  According to the lady that looked
15  at my eyes, my prescription has been the same.
16   Q.    Okay.  And are you nearsighted or
17  farsighted?
18   A.    Near.
19   Q.    Meaning that you have difficulty seeing
20  distance?
21   A.    Yeah.
22   Q.    Same.
23         All right.  And then I noticed that
24  prior to becoming a truck driver, you were a
25  CNA?
```

Page 24

```
 1   A.    Correct.
 2   Q.    Does that stand for certified nurse
 3  anesthetist?
 4   A.    Certified nurse aid.
 5   Q.    Aid, got it.  Tell me about the process
 6  by which you got that license?
 7   A.    I had to take a course for Indiana.  It
 8  was 105 hours of classroom and practical
 9  knowledge.  For the test, they would just
10  randomly select three different types of things
11  we should know, like how to do the Heimlich
12  Maneuver, or making a bed, or, you know,
13  lifting somebody from one place to another.
14   Q.    Changing compression socks?
15   A.    No.
16   Q.    Maybe not?
17   A.    No.
18   Q.    So it did involve a few tasks, correct?
19   A.    Right.
20   Q.    Okay.  And for how many years were you a
21  CNA?
22   A.    About two.
23   Q.    And in what states were you a CNA?
24   A.    Indiana and South Carolina.
25   Q.    And then I saw that you worked in a
```

*Angela M. Ickler, RPR*
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com






1  restaurant; is that correct?
2  A.    Yes.
3  Q.    Did you ever drive for the restaurant,
4  like delivery of food?
5  A.    No, I was a hostess.
6  Q.    Okay. Do you recall around what year
7  you were a hostess?
8  A.    No.
9  Q.    Do you -- what were the two years you
10 were a CNA?
11 A.    Let's see, as a truck driver --
12 Q.    I can give you a pad of paper if you
13 need.
14 A.    I would probably say 2011 to 2013.
15 Q.    Are there any other jobs you had prior
16 to going into trucking that we haven't
17 discussed?
18 A.    Temp agency. I was a housekeeper.
19 Q.    Around what year was that?
20 A.    2013.
21 Q.    In South Carolina?
22 A.    Yes.
23 Q.    All right. And then in 2013, you also
24 made the switch into trucking, correct?
25 A.    No. I think that was 2014.

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com

1  Q.    Okay. And what made you switch from
2  kind of the health care field to trucking?
3  A.    My plans completely fell apart. So I
4  had to figure out something else to do, and
5  truck driving was mentioned to me when I was a
6  hostess so I was like well, why not.
7  Q.    Sure. And then was it at that point
8  that you moved to Colorado and then took the
9  class in Utah?
10 A.    No, no.
11 Q.    Okay. So walk me through what happened
12 next?
13 A.    Colorado and then I did the class in
14 Utah.
15 Q.    Right. But so it was -- where were you
16 working as a hostess, I guess?
17 A.    Indiana. I was about 18, 19. So that
18 would have been 2008, 2009.
19 Q.    And that is when you were kind of
20 briefly told about the truck driving lifestyle?
21 A.    Uh-huh. There where I worked, there was
22 a hotel -- a Holiday Inn I think it was -- and
23 then there was a Schneider Truck Driving school
24 like further down the way. A lot of truck
25 drivers would come in and eat and stay at the

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com

1  hotel.
2  Q.    And it sounded like something you would
3  be interested in?
4  A.    No.
5  Q.    No.
6  A.    I wasn't interested in being a truck
7  driver.
8  Q.    Okay. So then your plans fell apart,
9  and you decided you needed something new?
10 A.    Yeah, and I was looking through
11 Craigslist, and it was like, come drive for
12 Central Refrigerated, and I was like, okay.
13 Q.    Okay. Cool. And so that was in 2014,
14 yes?
15 A.    Yes.
16 Q.    And do you know the month roughly?
17 A.    I would say I went there in March.
18 Q.    So about four years ago almost exactly?
19 A.    Yeah. That is about how long I got my
20 actual physical license, the end of March,
21 beginning of April.
22 Q.    All right. And then so you already
23 answered my question, you found Central
24 Refrigerated Services through Craigslist?
25 A.    Uh-huh.

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com

1  Q.    Who was your supervisor with Central
2  Refrigerated?
3  A.    I can't say.
4  Q.    Because you don't remember?
5  A.    Yeah.
6  Q.    That's fine. Were you an over-the-road
7  truck driver?
8  A.    Over the road. For them, I drove the
9  lower 48.
10 Q.    Everything but Hawaii and --
11 A.    -- and Alaska.
12 Q.    Thank you. Can you tell me your route,
13 were you just all over?
14 A.    Yeah, it just -- each destination was
15 different. I went somewhere different almost
16 everyday.
17 Q.    Almost everyday, okay. And for how long
18 were you employed with Central Refrigerated
19 Service total?
20 A.    A little over a year.
21 Q.    If I said 14 months, does that sound
22 right?
23 A.    Yeah. I think I left April-ish, May.
24 Q.    What were the conditions upon you
25 leaving?

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com






## Page 29

```
1   A.    It was the pay.
2   Q.    Not enough?
3   A.    No.  Now that I know what better pay
4   looks like, no it wasn't.  And I wanted to, I
5   don't know, drive locally for a little bit, but
6   then that was worse.
7   Q.    Okay.  And so when you drove locally,
8   was that when you were driving in Arizona?
9   A.    No.
10  Q.    Okay.  So tell me after you went from
11  Central Refrigerated, you said Central
12  Refrigerated became Swift Transportation?
13  A.    Right.
14  Q.    And did that occur within the two --
15  well, the 14 months?
16  A.    After they became Swift -- first, like,
17  Central Refrigerated was bought into Swift, but
18  I still went through the refrigerated division.
19  Q.    Got it.  Do you -- so you didn't have
20  like a Swift supervisor?
21  A.    No, Central Refrigerated.
22  Q.    And then you left and went where next?
23  A.    D.M. Bowman.
24  Q.    And tell me how you found D.M. Bowman?
25  A.    I don't think it was Craigslist, but it
```

## Page 30

```
1   was some type of online job.
2   Q.    So they didn't do any recruiting or
3   anything?
4   A.    No.
5   Q.    And then did you have to sit for any
6   kind of special D.M. Bowman exams before they
7   hired you?
8   A.    No.  It was more of just, you know,
9   giving your application.  Some recruiter kind
10  of lies to you a little bit, and then you get
11  hired, and then you sat in for the orientation.
12  They tell you about, you know, their rules and
13  regulations, speeds, and they were a hazmat
14  company so they went through hazmat training.
15  Q.    So you went through hazmat training?
16  A.    With them, yeah.
17  Q.    Did you drive a hazmat vehicle?
18  A.    No.  Well, I don't think so.
19  Q.    Okay.
20  A.    But I was with someone for like the
21  three days I was with D.M. Bowman so it could
22  have been, but he had his hazmat license
23  though.
24  Q.    Got it.  So that was when you were kind
25  of training, correct?
```

## Page 31

```
1   A.    Uh-huh.
2         THE COURT REPORTER:  Yes?
3         THE WITNESS:  Yes.
4   Q.    (By Ms. Benhamou) And can you give me a
5   time frame on the state of your employment with
6   D.M. Bowman, is that April of 2015 or May of
7   2015?
8   A.    I think 2015, yeah, because I went to
9   K & B in June.  So May, end of May.
10  Q.    You went to K & B in May of 2015,
11  correct?
12  A.    I believe so.
13  Q.    So you were only with D.M. Bowman for
14  how long then?
15  A.    A few days.
16  Q.    What were the conditions upon you
17  leaving D.M. Bowman?
18  A.    They lied.  The recruiter told me that I
19  would be driving about 600 miles everyday, and
20  for the amount of pay that they were offering
21  me, I was like, okay, that is doable.  But when
22  I got there, it was just an Indiana-to-Chicago
23  route and back.  That is, like, only a couple
24  hundred miles everyday with traffic, and I'm
25  delivering.  I wasn't going to do that.
```

## Page 32

```
1   Q.    Got it.  And were you going to be paid
2   by the mile?
3   A.    Yes.
4   Q.    How much per mile?
5   A.    I think they were offering me between 34
6   and 38 cents, but depending on fuel mileage and
7   how fast I was going.
8   Q.    Sure.
9   A.    So a lot of extra stuff.
10  Q.    There were conditions on how much you
11  would get, yes?
12  A.    Yes.
13  Q.    And you wouldn't be salaried, too, this
14  would just be purely how much you made per
15  mile, correct?
16  A.    Correct.
17  Q.    Okay.  So you left after a few months?
18  A.    No.
19  Q.    No?
20  A.    Days.
21  Q.    Few days, sorry.  Excuse me.
22  A.    I did the Indiana-Chicago trip twice
23  before I had to ask whatever supervisor was
24  there if that was going to be my thing, and he
25  was like, yes, and I was like, no.
```





1  Q.  Then you left?
2  A.  Yeah.
3  Q.  Respect.  So taking into account all of
4  your previous experience with Swift/Central,
5  which I'm going to lump together, and then
6  Bowman, how many years had you been driving a
7  truck total before January 20th of 2016?
8  A.  Probably close to, probably two years.
9  Q.  Almost two years?
10 A.  Yeah.
11 Q.  Okay.
12 A.  Just a few months shy of two years.
13 Q.  And in how many occasions total, and you
14 can estimate on this, had you had the
15 opportunity to drive in snow, snowy conditions?
16 A.  At least twice.
17 Q.  And that is before January of 2016?
18 A.  Okay.  Then that is the one time.
19 Q.  Then one time, got it.
20 A.  I think.
21 Q.  What about icy conditions before January
22 of 2016?
23 A.  I think it was twice.  It would have
24 been twice, yeah.
25 Q.  All right.  You agree with me that the

1  number one rule of driving a truck is safety,
2  yes?
3  A.  Yes.
4  Q.  And you agree that as a professional
5  driver, you require special driving training?
6  A.  Yes.
7  Q.  We already talked about your CDL
8  courses.  Other than the course with Utah, when
9  you began your employment with K & B, did you
10 go through additional orientation?
11 A.  What do you mean?
12 Q.  Like did you have any kind of safety
13 training when you began employment with K & B?
14 A.  All truck companies have their own
15 little orientation safety things, and they --
16 you always do a ride-along just to be sure you
17 are not going to mess up their equipment.
18 Q.  Sure.  Sure.  Okay.  And specific to the
19 K & B course --
20 A.  Uh-huh.
21 Q.  -- did you learn about inclement weather
22 condition driving?
23 A.  Yeah, but that is a daily ongoing thing.
24 Q.  Meaning what?
25 A.  Meaning through the little messages

1  everyday -- slow it down; wear your seatbelt;
2  pay attention; if it is raining, slow down;
3  stuff like that everyday.
4  Q.  Sure.  And those come through the
5  QTRACS, right?
6  A.  Qualcomm, yeah.
7  Q.  Okay.  Is the Qualcomm synonymous with
8  QTRACS?
9  A.  QTRACS is first time I ever heard of it
10 around here.
11 Q.  Okay.  I'll show you in a minute why I
12 call it QTRACS, but we will say through the
13 Qualcomm then.
14     So then you are told on a frequent
15 basis drive safely, drive slowly with inclement
16 weather conditions?
17 A.  Yeah.
18 Q.  Did you learn about night driving?
19 A.  That is just something that you --
20 on-the-job training, period.
21 Q.  Got it.  Common knowledge?
22 A.  Yeah.  It is mostly -- that kind of
23 started with Swift, you know, pay attention,
24 realize the signs of fatigue, get out of your
25 truck, stop, take a break, walk around, stuff

1  like that.
2  Q.  Okay.  Do you always carry a copy of the
3  Federal Motor Carrier Safety Regs in your
4  truck?
5  A.  Yeah.
6  Q.  And has that been the case for all of
7  the trucking companies you've worked for?
8  A.  Uh-huh.
9      THE COURT REPORTER:  Yes?
10 A.  I have -- yes.  I have several copies of
11 both books with hazmat and the Federal Motor
12 Regulations?
13 Q.  Got it.  You answered my question.
14    On January 20, 2016, did you have an
15 onboard camera in your cab by any chance?
16 A.  Probably.  I mean, like wait, what do
17 you mean?  Like the actual disposable, or an
18 actually camera that records?
19 Q.  A camera that records as you drive?
20 A.  No.
21 Q.  So driving a truck requires safe driving
22 habits, yes?
23 A.  Yes.
24 Q.  Good health?
25 A.  Yes.

```
 1   Q.    A sharp mind?
 2   A.    That is debatable.
 3   Q.    Debatable.  Tell me why that is
 4   debatable.
 5   A.    Everybody is not all that smart when it
 6   comes to driving on the road regardless if you
 7   are a truck driver or a four wheeler.
 8   Q.    Very fair.  But you would agree with me
 9   that when you are in charge of an 80,000-pound
10   vehicle --
11   A.    Yes.
12   Q.    -- you have to have a sharp mind, right?
13   A.    Yes.
14   Q.    Okay.  And it is your obligation as a
15   trucker in charge of an 80,000-pound vehicle to
16   be in control of yourself and your vehicle,
17   right?
18   A.    Yes.
19   Q.    Well, because you have to drive at your
20   best regardless of whether anyone else is
21   paying attention, correct?
22   A.    Right.
23   Q.    Right.  How do you generally navigate
24   while driving?
25   A.    What do you mean?
```



```
 1   Q.    So do you get your routes from the
 2   Qualcomm?
 3   A.    I have discharged routes, yes.
 4   Q.    And then I know I'm personally dependent
 5   on Waze so I would have my -- have you ever
 6   heard of Waze?
 7   A.    No.
 8   Q.    Okay.  It is an application that tells
 9   me the fastest route based on traffic --
10   A.    Such as Google Maps and things like
11   that?
12   Q.    Exactly.  You don't use anything like
13   that?
14   A.    The Qualcomm has a navigational system.
15   Q.    Okay.
16   A.    And I also check because Google has a
17   way of telling you if there is traffic or if
18   there is an accident, things like that.
19   Q.    So you do use Google Maps?
20   A.    Uh-huh.
21   Q.    Yes?
22   A.    Yes.
23   Q.    And you would use Google Maps on your
24   phone?
25   A.    Yes.
```



```
 1   Q.    And so do you have your phone like up on
 2   the dashboard?
 3   A.    No.  I'm not all that tall so I need all
 4   the space so I can see.
 5   Q.    Okay.  So where would your cell phone
 6   generally be while you are operating your
 7   truck?
 8   A.    Lower.  There is -- cup holders, if I
 9   need to, but I don't really have it in a way
10   that I can mess with it.
11   Q.    Got it.  It is just kind of in front of
12   you?
13   A.    I can see but without having to --
14   Q.    -- to turn your head away from the road,
15   correct?
16   A.    Yes.
17   Q.    And do you have it on loud, too, so she
18   can tell you --
19   A.    No.  I have everything turned off.
20   Q.    Okay.  Understood.  And that would also
21   be the case in 2016?
22   A.    Yes, everything was turned off.
23   Q.    But you would still use Google Maps just
24   to double check --
25   A.    -- traffic.
```



```
 1   Q.    -- traffic?
 2   A.    Because the Qualcomm doesn't really tell
 3   you that.  It just gives you a route, a
 4   specific route.  Sometimes there has been
 5   detours that Google Maps has told me about that
 6   Qualcomm doesn't know.
 7   Q.    Sure.  Look into Waze.
 8         So you are familiar with the FMCSR?
 9   A.    Yes.
10   Q.    You understand the purpose of the rules?
11   A.    Yes.
12   Q.    Where did you get that understanding?
13   A.    Through training.
14   Q.    And was that Utah training?
15   A.    Yes.
16   Q.    Have you ever in your -- well, now four
17   years of being a truck driver been told that
18   you have been in violation of FMCSR?
19   A.    No.
20   Q.    Do you agree that everyone operating a
21   motor vehicle has a duty to drive reasonably?
22   A.    Yes.
23   Q.    Do you agree as a truck driver because
24   you have a CDL, you have to follow the FMCSR
25   which are the industry standards?
```



41

1  A.  Yes.
2  Q.  And because you have A CDL, the FMCSR
3  imposes upon you a duty to act carefully while
4  driving your truck?
5  A.  You mean safely, yes.
6  Q.  Yes. Is safely different than carefully
7  in your mind?
8  A.  A little bit.
9  Q.  Tell me why.
10 A.  I mean carefully is, you can be driving
11 slower than traffic, and that could cause
12 problems. I kind of learned that the hard way
13 once driving through Chicago the first time, I
14 drove carefully and not safely, and that caused
15 a bunch of cars to kind of pack into the space
16 that I left, derogatory like roaches really,
17 and they just swarmed that little space.
18 Q.  Got it.
19 A.  So there is a difference.
20 Q.  So you were trying to keep a safe
21 distance between the vehicle in front of you --
22 A.  Yeah.
23 Q.  -- and you had maybe too much distance?
24 A.  A little bit.
25 Q.  Go ahead, sorry.

42

1  A.  It caused cars to just pack in. So I
2  learned to leave space, but not that much
3  space.
4  Q.  Got it. So you have to hit the perfect
5  formula of perfect amount of space between you
6  and the vehicle in front of you?
7  A.  Yeah. So you can drive carefully, but
8  sometimes it is not always that safe.
9  Q.  Right. And you have to drive
10 defensively, correct?
11 A.  True.
12 Q.  Were you taught about defensive driving?
13 A.  Yes.
14 Q.  Tell me a little bit about what
15 defensive driving means?
16 A.  To me?
17 Q.  To you.
18 A.  That is paying attention to everything
19 going on around me, maintaining my lane, if I
20 am looking -- always looking forward, slowing
21 down if need be, and giving the car in front of
22 me plenty of space. And like I said, watching
23 in my mirrors because people have done some
24 really crazy things.
25 Q.  I bet. And how frequently do you do

43

1  mirrors scans when you are operating your motor
2  vehicle?
3  A.  About every three seconds.
4  Q.  Every 30 seconds?
5  A.  Three.
6  Q.  Three, got it.
7  A.  Yeah.
8  Q.  Does that involve you even rotating your
9  neck at all, or can you do your mirrors scans
10 from just glancing with your eyes and your
11 peripheral vision?
12 A.  No, I have to turn my head.
13 Q.  You do have to turn your head?
14 A.  Yeah. The way that the truck is, the
15 length of the truck, you know, the depth, you
16 have to look at all of the mirrors because
17 people they hang out in spots.
18 Q.  In your blind spots?
19 A.  They are not really blind spots. They
20 are just harder to see.
21 Q.  Got it. Got it. And tell me a little
22 bit about how your seat is positioned -- your
23 driving seat in your truck. Because you are
24 little like me, so I'm trying to picture how it
25 works.

44

1  A.  For me, this truck that I'm in now, I
2  sit fairly close to the floor.
3  Q.  Okay. So you can reach the pedals?
4  A.  That and I don't like the bouncing.
5  Q.  Got it. And in January of 2016, did you
6  sit a little bit higher up?
7  A.  In that particular truck, I did sit a
8  little higher.
9  Q.  Would you find that you bounced more
10 frequently?
11 A.  No. It was just the way that the seats
12 were. Like in this truck, the seat is
13 different from the truck -- than that
14 particular truck.
15 Q.  Got it. Got it. When did you switch
16 trucks?
17 A.  You mean now?
18 Q.  Between the one you had in 2016 and the
19 one you have now?
20 A.  I have had two. So this recent one, I
21 don't know maybe a few months ago.
22 Q.  And what was the truck that you switched
23 to immediately after the truck which was
24 involved in the accident? Was it a different
25 kind of truck, a different weight that you

## Page 45

```
 1   could carry?
 2   A.      No, they are all the same.  They are
 3   just, you know, some were maybe a little older,
 4   but they are all basically the same.
 5   Q.      Got it.  So with K & B, how many trucks
 6   have you had total?
 7   A.      In my lifetime you mean?
 8   Q.      Yeah.
 9   A.      Four.
10   Q.      And the one you were operating in
11   January of 2016, would have been your first?
12   A.      Second.  Yeah, it was my second truck.
13   Q.      For how long did you drive your first
14   truck through K & B?
15   A.      I think I drove that one for maybe three
16   or four months.
17   Q.      What were the circumstances in which you
18   switched from that truck to the truck you drove
19   in January 2016?
20   A.      It was having electrical issues, and
21   they couldn't figure out where exactly the
22   issue was coming from.
23   Q.      Got it?
24   A.      So it was best just to switch the truck.
25   Q.      Better safe than sorry?
```

## Page 46

```
 1   A.      Well, yeah, they offered.  They said I
 2   could come in and get it fixed, or I could
 3   switch trucks.  Switched trucks, and I was off.
 4   Q.      All right.  Might as well.
 5           All right.  So we talked about K & B's
 6   training a little bit and the orientations, are
 7   there -- since you started back in 2014 --
 8   sorry, 2016?
 9   A.      '15.
10           MS. ELI:  2015.
11   Q.      (By Ms. Benhamou) Sorry, 2015.  Let me
12   write it down so I don't forget.
13           Have you had any recurring like
14   continuing education courses through K & B?
15   A.      Meaning I would have to actually go into
16   the terminal and have courses?
17   Q.      Correct.
18   A.      No.  Every Monday we have a safety talk.
19   Q.      And how do you have the safety talk?
20   A.      On the phone.
21   Q.      And who is that talk with?
22   A.      My dispatcher.  So for -- I don't
23   remember the name of my first dispatcher, but
24   right now it is Matt Ard.
25   Q.      Spell his last name, please.
```

## Page 47

```
 1   A.      A-R-D.
 2   Q.      How long do you two talk every Monday?
 3   A.      For a few minutes.  It is just reading
 4   it off and asking me if I understand it, and if
 5   I have questions.
 6   Q.      Like around 15 minutes?
 7   A.      No, it doesn't take that long.
 8   Q.      Okay.  And is he reading you off any
 9   potentially new protocol?
10   A.      No.  It is the same thing all the time.
11   Q.      Same thing every Monday?
12   A.      Yeah.
13   Q.      Okay.  And in 2015, was Matt Ard your
14   dispatcher, too?
15   A.      No, I don't think so.
16   Q.      Was it Josh Winkle?
17   A.      Yeah, that is his name.
18   Q.      And for how long had Mr. Winkle been
19   your dispatcher?
20   A.      From the time that I started until the
21   time he quit.
22   Q.      Got it.  So he is no longer with K & B?
23   A.      No.
24   Q.      Do you know roughly when he quit?
25   A.      No.
```

## Page 48

```
 1   Q.      Within the last year?
 2   A.      It has been longer than that I think.
 3   Q.      Okay.  Have you -- well, have you
 4   received a copy of the K & B handbook?
 5   A.      Yes.
 6   Q.      Do you keep a copy of it in your truck?
 7   A.      Probably.
 8   Q.      You probably don't have to revisit it
 9   very often, correct?
10   A.      No.
11   Q.      I am correct?  We had a double negative.
12   It was my fault.
13   A.      Okay.
14   Q.      Am I correct in saying that you don't
15   have to revisit the handbook very often?
16   A.      No.
17   Q.      No I'm not correct?
18   A.      I don't have to revisit the handbook
19   very often.  If I have questions, I can always
20   call Matt, and if he doesn't know, he will send
21   me to somebody else.
22   Q.      Perfect.  And that is Matt Ard?
23   A.      Yes.
24   Q.      Okay, got it.  And in your experience as
25   a professional driver, either through courses
```

Page 49

1  or just on-the-job training, have you ever been
2  made aware of some of the dangers associated
3  with vehicles that have become disabled on
4  interstate highways?
5  A.    Such as four-way flashers, cars are just
6  hanging out on the side?
7  Q.    Exactly.
8  A.    Yes.
9  Q.    And tell me what you do in circumstances
10 where you are approaching a vehicle that is on
11 the side of the road?
12 A.    If I can, I will get over; if not, I
13 will slow down.
14 Q.    Okay. And generally are you driving in
15 the right-hand lane?
16 A.    Yes.
17 Q.    Always?
18 A.    Depending on the situation.
19 Q.    Sure.
20 A.    If there is signs that says, trucks to
21 the left or trucks in the center, you know.
22 Q.    You follow the rules?
23 A.    Yes.
24 Q.    Okay. Have you heard the safety
25 campaign, sharing the road with others safely?

Page 50

1  A.    I know for motorcycles specifically,
2  yeah.
3  Q.    Okay. Would you agree as part of that
4  road campaign that whenever possible, you
5  should try to give more room to other vehicles
6  on the road?
7         MS. ELI: I'm just going to
8  object to the foundation of this campaign.
9  Only answer what you know about this campaign.
10 A.    I don't know much about the campaign. I
11 just know specific safety-wise, give distance;
12 if people are on the side of the road, move
13 over; if not, slow down.
14 Q.    Perfect. So you've been trained on
15 proper space management methods?
16 A.    Yes.
17 Q.    And we talked about defensive driving
18 techniques. Do you agree that to drive safely,
19 you must decrease your speed as your visibility
20 decreases?
21 A.    Yes.
22 Q.    And do you agree that your high beams
23 would shine substantially further than your low
24 beams?
25 A.    What are you asking me?

Page 51

1  Q.    So you have two sets of lights on your
2  truck, right?
3  A.    Correct.
4  Q.    High beams and low beams?
5  A.    Correct.
6  Q.    My understanding is that the low beams
7  don't shine as far out into the distance as
8  your high beams do, is that true?
9  A.    That is what they say. For me
10 personally, I don't really notice a difference.
11 Probably since I drive so much at night, I have
12 good night vision. So it all looks the same to
13 me.
14 Q.    Okay. Generally when you are driving,
15 do you rely on your low beams or your high
16 beams?
17 A.    Low beams.
18 Q.    Low beams. Would you agree that it
19 takes you longer to stop your tractor-trailer
20 than it would take to stop a regular non-CMV
21 vehicle?
22 A.    Yes.
23 Q.    Do you happen to know the average
24 stopping distance for a loaded tractor-trailer
25 traveling at 55 miles per hour?

Page 52

1  A.    You mean a fully loaded or empty
2  trailer?
3  Q.    Fully loaded.
4  A.    They say it is half the distance of a
5  football field, but for me personally, it has
6  taken about -- without, you know, slamming on
7  the brakes, about that, yeah.
8  Q.    It takes about half a football field?
9  A.    Yeah, about 10, 15 seconds.
10 Q.    And have you noticed in your driving
11 that your braking distance can vary based upon
12 weather conditions?
13 A.    Yeah.
14 Q.    So if it is raining outside, maybe you
15 would start braking earlier rather than the
16 time you would start braking normally if it was
17 dry outside?
18 A.    Yeah, you can hydroplane.
19 Q.    Okay. Same thing for snow and ice? You
20 would start braking earlier?
21 A.    You would start braking way earlier.
22 Q.    Okay. Are you familiar with the Federal
23 Motor Reg 392.14?
24        MS. ELI: Object just to the
25 numbers.

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com





1  A.    Yeah, those numbers, I don't know.
2  Q.    (By Ms. Benhamou) Okay. So it is just
3  hazardous conditions, extreme caution? Are you
4  familiar with that one? I can show it to you.
5        MS. BENHAMOU: Here we go. We
6  can mark this actually as Exhibit No. 1.
7  Lamis, I have a copy for you, too.
8              (Exhibit No. 1 was marked for
9               identification.)
10 Q.    (By Ms. Benhamou) Are you familiar with
11 this federal regulation?
12 A.    In common-sense terms, yes.
13 Q.    Do you agree that the Reg states, or
14 rather it mandates that speeds shall be reduced
15 when such conditions exist?
16 A.    Common sense, yes.
17 Q.    But it also says it in the language?
18 A.    In this first one?
19 Q.    Yes, correct.
20 A.    Uh-huh.
21 Q.    And based on your common sense, tell me
22 what "sufficiently dangerous conditions" would
23 mean to you?
24 A.    I really want to say anytime it can be
25 really dangerous. It just depends on the

1  situation of people who are around if you are
2  in that situation. It doesn't matter if it is
3  sunny and dry --
4  Q.    Sure.
5  A.    -- really bad things could happen.
6  Q.    You have to pay attention at all times?
7  A.    Yeah.
8  Q.    And you have to anticipate what other
9  drivers on the road might do, right?
10 A.    Correct.
11 Q.    It sounds exhausting. Is it exhausting?
12       MS. ELI: I'm going to object to
13 the question for the relevance of it. Don't
14 answer that. I would ask, please, keep going.
15 Q.    (By Ms. Benhamou) Okay. Are you aware
16 that you have the right to refuse to drive in
17 conditions you deem unsafe?
18 A.    Yes.
19 Q.    Have you ever had to do that?
20 A.    No.
21 Q.    Do you know anywhere in the K & B policy
22 or handbook where it would say you have the
23 right to refuse to drive in unsafe conditions?
24 A.    Specifically, no, but it is verbally
25 told to us that if you are tired or if the

1  weather is too bad or whatever, let dispatcher
2  know, communication.
3  Q.    Got it. Okay. Let's talk about
4  logbooks. You agree that it is very important
5  to keep accurate driving logs?
6  A.    Correct.
7  Q.    Tell me why that is important?
8  A.    You get tired. It is also -- I don't
9  really -- actually, I don't really know the
10 point of the logbooks, but I do know that a lot
11 of drivers if they drive too long without
12 breaks or whatever, you can get tired. So I
13 can understand that part of it, but the rest.
14 Q.    Okay. Would one reason why drivers
15 might falsify their logs be to try to work
16 extra hours to make more money?
17       MS. ELI: I'm going to object to
18 an incomplete hypothetical and foundation.
19 Q.    (By Ms. Benhamou) If you understood my
20 question, you can answer, unless Lamis directs
21 you otherwise.
22 A.    Okay. So ask it again.
23 Q.    So I was trying to think about reasons
24 why drivers would falsify their logs, and
25 hypothetically -- and I'm not saying you

1  specifically -- would one reason be to work
2  extra hours so that they could incur extra
3  income?
4  A.    That has been a debate, but I don't know
5  anybody that has ever done it.
6  Q.    It doesn't speak to you personally?
7  A.    No. I make enough money without having
8  to lie about my hours.
9  Q.    That's good. Have you ever been cited
10 for lying about your logbooks?
11 A.    Not intentionally, no.
12 Q.    What do you mean by that?
13 A.    Like there has been an instance where I
14 put myself on duty, but I started driving
15 apparently too soon, and then it just kicked
16 off the on-duty time I had into drive time, and
17 I didn't realize it until the very next day,
18 and it was too late to fix it.
19 Q.    Got it. And how do you -- around what
20 year did that happen?
21 A.    Last year sometime. I don't really
22 remember.
23 Q.    With K & B?
24 A.    Correct.
25 Q.    And tell me in 2016, did you keep a hard

```
 1   copy logbook?
 2   A.      If the Qualcomm went down, yes.
 3   Q.      Okay.  How frequently would the Qualcomm
 4   go down?
 5   A.      I've never had to use it.
 6   Q.      You've never had to use Qualcomm?
 7   A.      The paper logs.
 8   Q.      Got it.  So it is just as a backup?
 9   A.      Yes, that is what they are for.  You are
10   not allowed to have two sets of logs in your
11   truck at any time.
12   Q.      Understood.  And you don't have two sets
13   of logs?
14   A.      No.  I have paper logs for backup.  They
15   are just blank, and then I have the E-logs.
16   Q.      Okay.  And tell me around what time of
17   day would you log your hours or log your time?
18   A.      What do you mean?  It does manually by
19   the minute.  So whenever I start my clock
20   on-duty time, that is when my clock starts.
21   Q.      Okay.  Tell me a little bit about the
22   11-hour rule?
23   A.      You mean hours of service period, or
24   just the 11 hours?
25   Q.      Just the 11-hour rule.
```

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com 

```
 1   A.      You can only drive 11 hours in a 14-hour
 2   period.
 3   Q.      Okay.  And how many hours of sleep do
 4   you have to get?
 5   A.      You have to be either off duty, sleeper,
 6   or a combination of both for ten hours minimum.
 7   Q.      And that is within a 24-hour period?
 8   A.      That is whenever.  So if you only drive
 9   for 5 minutes down the road and you want to
10   take another 10-hour break, just to get those
11   10 hours, that 5 minutes back you can, or you
12   can take a split sleeper berth.  An eight-two,
13   eight hours in the sleeper, two however you
14   wish to get that time back, but you have to
15   take ten hours.
16   Q.      And in the sleeper berth is it strictly
17   for sleeping, or can you watch TV in the
18   sleeper berth?
19   A.      Whatever you do back there in the back
20   is your business.
21   Q.      Got it.  Okay.  Thank you.  Have you
22   ever been dispatched by K & B when you've been
23   out of hours?
24   A.      No.
25   Q.      Okay.  If you had been --
```

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com 

```
 1   A.      Well, wait a minute.  What do you mean?
 2   Q.      So I would anticipate that maybe a
 3   dispatcher -- and this is hypothetical --
 4   didn't fully understand that you were out of
 5   hours, asked you to do a job that you just
 6   didn't have enough hours to do, and then would
 7   it be incumbent on you to say, hey, no, I can't
 8   take that load?
 9   A.      Okay.  You need to kind of break that
10   down just a little bit more.  Do you mean as in
11   I'm supposed to drive?
12           MS. ELI:  Let her ask you the
13   question all over again.
14   Q.      (By Ms. Benhamou) Okay.  I'll ask it all
15   over again.  Generally your dispatchers know
16   what your hour logs look like, right?
17   A.      Right.
18   Q.      Has it ever happened where a dispatcher
19   inadvertently misunderstood how many hours left
20   you had to drive under the rules and sent you
21   on a trip that you couldn't complete?
22   A.      I'm a little confused.  Like what do you
23   mean, am I supposed to just start driving, or
24   you just telling me this is my load
25   information, and can you accept or not, is
```

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com 

```
 1   that --
 2   Q.      The latter.  This is your load
 3   information, can you accept it or not.
 4   A.      That has happened, but it is my job to
 5   go over it and look at it and check my hours.
 6   And if I can't do it, go back and say, hey, I
 7   cannot do this for my hours.  Then they will
 8   say, okay, and they will find me something
 9   else.
10   Q.      Got it.  Is there someone at K & B who
11   would be responsible for auditing your logs in
12   2016?
13   A.      Logs?
14   Q.      Yeah, your driving logs?
15   A.      Logs.  I mean literally --
16   Q.      Oh, logs is a department?
17   A.      Yeah.
18   Q.      Sorry.  Do you know who works in logs?
19   A.      I just know them as logs.  I'm sorry.
20   Q.      Okay.  Would you agree with me that one
21   of K & B's number one -- well, their number one
22   goal is to deliver customers' freight safely
23   and on time while still abiding by the Federal
24   Motor Carrier Safety Regs?
25   A.      Yes.
```

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com 

1  Q. And you would agree that any preventable
2  late delivery to a critical customer may result
3  in termination?
4  A. What do you mean by "preventable"?
5  Q. So if you overslept or failed to set
6  your alarm?
7  A. So ask the question again.
8  Q. Sure. You would agree that any
9  preventable late delivery to a critical
10 customer may result in immediate termination?
11 A. No.
12 Q. You don't know?
13 A. No. I mean, personally it has not ever
14 happened to me so I cannot say.
15 Q. Okay. Do you have truck driver friends
16 who work with K & B?
17         MS. ELI: I'm going to object to
18 the relevance of that. If you know other K & B
19 drivers, go for it, but if not --
20 A. I'm anti-social so no.
21 Q. (By Ms. Benhamou) Are you eligible for
22 bonuses through K & B?
23 A. They are called safety bonuses.
24 Q. Explain to me how those work, please.
25 A. As far as I'm aware, as long as you've



1  not had any accidents, or you've not got any
2  tickets -- speeding tickets, you've not been in
3  violation like at the scale house, I think that
4  is it, but that is about as far as I know.
5  Q. Okay. And in your time with K & B, have
6  you gotten the safety bonus each year?
7  A. It is twice a year. I think I've gotten
8  it at least twice. I'm not really sure.
9  Q. And then are you paid with K & B by the
10 mile, too?
11 A. Uh-huh.
12 Q. Yes?
13 A. Yes.
14 Q. Do you have a salary, base salary in
15 addition?
16 A. No, just all by mile.
17 Q. Okay. And how much are you paid by the
18 mile?
19 A. Right now I make fifty cents a mile.
20 Q. And is it custom and practice with K & B
21 to send you messages through the Qualcomm that
22 reinforces your bonus eligibility periodically?
23 A. What do you mean?
24 Q. So when I would go through QTRACS
25 records I saw some -- some mention of, Reminder



1  be safe so that you can get your bonus type of
2  thing. Have you seen those messages?
3  A. Yeah. But it is mostly just reminders
4  that hey we do have a safety bonus program;
5  hey, we do have a referral program; hey, we
6  have this and that, and the safety just comes
7  everyday, be safe period.
8  Q. Got it. So safety comes every single
9  day?
10 A. Yeah, safety comes every single day.
11 Q. And weather comes every single day?
12 A. Yes, I do get weather for different
13 parts of the country, yes.
14 Q. And you are obligated to read all of
15 those, right?
16 A. Not necessarily.
17 Q. No?
18 A. I mean they pretty sure want you to read
19 them.
20 Q. Understood. Let's talk about the day of
21 the accident. Do you have an independent
22 recollection of the wreck, meaning before
23 looking at a police report or before we brought
24 a lawsuit, did you remember the accident?
25 A. Yeah.



1  Q. Do you recall the weather conditions on
2  the morning of January 20th?
3  A. It was slick, a little icy.
4  Q. Was it still dark outside?
5  A. Yeah.
6  Q. You said that with emphasis?
7  A. Because I was surprised I don't remember
8  it being that dark.
9  Q. Do you recall what your normal sleep
10 times were in January of 2016?
11 A. They always vary.
12 Q. Okay. So maybe one day you would be
13 sleeping during the day, the next day --
14 A. Not -- not that much variance. But
15 there is -- I might go to sleep one day from
16 like noon to 10:00 p.m. or something like that,
17 or 1:00 to 11:00, something like that, or
18 11:00. It just depends on when I finish my
19 load, and what time it has to be there. So a
20 little bit of variance.
21 Q. Got it. But generally, you would be in
22 the sleeper berth during daytime hours for 9:00
23 to 5:00 people, does that make sense? I can
24 clarify.
25 A. Yeah.

