# EXHIBIT "A"
# (3 of 3)

129

1  Q. Okay. How long in total do you think
2  you were at the crash site?
3  A. Probably an hour.
4  Q. Did you attempt to render any medical
5  aid to my client?
6  A. Other than asking him if he was okay,
7  did he want water, no.
8  Q. Do you believe on the day of the wreck
9  you were acting as safely as possible in your
10 operation of CMV?
11 A. Yes.
12 Q. Okay. Think back to the day. What, if
13 anything, could you have done differently on
14 that day or days prior to the wreck that may
15 have avoided the wreck entirely?
16 A. Nothing.
17 Q. Do you agree that it would have been
18 reasonable for someone in your position to
19 reduce their speed on the day of the accident
20 given the snowy conditions?
21 A. No. I drove at the speed I felt was
22 comfortable for the conditions.
23 Q. Do you have any opinion as to what
24 actual speed you were going -- miles per hour
25 -- at the time of the collision?


130

1  A. No. I was not staring at my
2  speedometer.
3  Q. Could you estimate?
4  A. No.
5  Q. Do you admit that you had the last clear
6  chance to avoid the wreck?
7  A. No.
8  Q. Do you admit you could not see 450 feet
9  ahead of you in the two minutes before the
10 collision?
11 A. Are you asking me if the skies were
12 clear and I was capable of seeing him, yeah I
13 could see.
14 Q. Okay. We talked about your cell phone;
15 we talked about Bluetooth. Can we agree that
16 the accident didn't occur because you were
17 distracted?
18 A. Yes.
19 Q. Can we agree that the accident didn't
20 occur because you were aggressively driving?
21 A. Yes.
22 Q. Can we agree that the accident didn't
23 occur because of your incompetency? Meaning
24 that you didn't know how to respond to a
25 situation such as that.


131

1  A. Yes.
2  Q. Yes we can agree that that is not what
3  caused the accident?
4  A. Yeah, that is not what caused the
5  accident.
6  Q. Okay. Can we agree that you didn't have
7  an extreme blunder that doesn't fit into
8  anything that I just explained which caused the
9  accident?
10 A. No.
11 Q. Is that because extreme blunder doesn't
12 make sense to you?
13 A. Yeah.
14 Q. Can we agree that there was no sudden
15 emergency that occurred in your cab that
16 resulted in the accident?
17 A. Correct.
18 Q. Okay. Can you tell me if you made it to
19 Newport, Michigan by 4:00 a.m. on January 21st?
20 A. No. After my tractor and the trailer
21 was towed, I got a hotel room, and I was given
22 a new tractor. I don't think I know what
23 happened with that load after that.
24 Q. Did someone come and cover your load?
25 A. More than likely.


132

1         MS. BENHAMOU: I have no further
2  questions for you right now.
3         MS. ELI: All right. Kiara, I
4  have a bit to go through with you. I'm going
5  to ask for a break just so that I'm sure I can
6  cover everything. So just five minutes just so
7  I can make sure I have everything that I need
8  to cover.
9         MS. BENHAMOU: Take your time.
10        (A brief recess was taken
11        at this time.)
12        MS. ELI: I'm ready to go back
13 on the record if you are.
14        MS. BENHAMOU: Sure.
15         CROSS-EXAMINATION
16 BY MS. ELI:
17 Q. All right. Kiara, I have some stuff I
18 want to go through with you just to make sure
19 we have a clean record of it. Now, the load
20 that you had been carrying, the final
21 destination was for Newport, Michigan, correct?
22 A. Yes.
23 Q. When you had stopped at Urbana, did you
24 pick up material, or did you drop off material
25 in Urbana?



Page 133

```
 1   A.    I dropped off material at Urbana.
 2   Q.    Okay.  But not all of the material you
 3   had, correct?
 4   A.    Correct.
 5   Q.    That means that when you were traveling
 6   to Newport, Michigan, you didn't have a full
 7   truck, correct?
 8   A.    Correct.
 9   Q.    That means you would have been operating
10   at a lighter load at that point, correct?
11   A.    Correct.
12   Q.    We indicated earlier that the maximum
13   that a truck is allowed to weigh total is
14   80,000 pounds, correct?
15   A.    Correct.
16   Q.    Is it safe to say, then, that you were
17   operating at less than that 80,000?
18   A.    Yes.
19   Q.    Would we have to look at your Bills of
20   Lading in order to determine the exact mass of
21   everything that you were carrying?
22   A.    Yes.
23   Q.    Okay.  Are Bills of Lading something
24   that you are familiar with reading, or is that
25   something we can leave to the corporate
```

Page 134

```
 1   representative for K & B?
 2   A.    I can read them, yes.
 3   Q.    You can read them.  Okay.  I'll bring
 4   those out.  Actually, you know what, it is
 5   okay, we don't need to go through that at this
 6   point.
 7         Kiara, you talked about when you saw
 8   Mr. Perez start to spin, that initial spin, you
 9   engaged in a practice of five seconds on, five
10   seconds off on your brake, correct?
11   A.    Right.
12   Q.    Do you remember how many rounds you were
13   able to do of that five seconds on, five
14   seconds off?
15   A.    At least four.
16   Q.    At least four rounds before you caught
17   up with him, correct?
18   A.    Correct.
19   Q.    So assuming you did four rounds of it,
20   and each round is ten seconds total, is that
21   accurate?
22   A.    Each compression of the brake is like
23   five seconds, and then --
24   Q.    -- you stop for five seconds?
25   A.    No.  I hit the brakes for five seconds,
```

Page 135

```
 1   and then let up for a few, and then hit for
 2   another five seconds, and then let up for a few
 3   seconds --
 4   Q.    Okay.
 5   A.    -- hit for five seconds.
 6   Q.    So do you think you hit the brake four
 7   times?
 8   A.    At least four times, yeah.
 9   Q.    So you at least were 20 seconds until
10   you caught up with him, is that accurate?
11   A.    Correct.
12   Q.    Were you behind him in that right lane
13   the entire time?
14   A.    Not directly.
15   Q.    That was a bad question.  From the time
16   you saw him spin to the time of impact, did you
17   leave the right lane?
18   A.    No.
19   Q.    Okay.  Now, you indicated that when you
20   initially spoke with Mr. Perez, he seemed a
21   little bit out of it.  Can you describe -- can
22   you explain that a little bit more maybe as to
23   what gave you the sense that maybe he had been
24   out of it?
25   A.    Honestly just the look of him.  I
```

Page 136

```
 1   wouldn't say he could have been dazed, but to
 2   me, he just seemed more like a flighty,
 3   whimsical-type person.
 4   Q.    Was his -- were his actions, would you
 5   categorize them as erratic?
 6   A.    I think more along the lines of flighty.
 7   Like he is -- like he is thinking of something
 8   else rather than he wasn't just in the
 9   particular situation as it were.
10   Q.    Okay.
11   A.    Like he was mentally elsewhere while I
12   had to draw his attention back to me or the
13   situation with questions.
14   Q.    Got it.  Do you know, did he give you
15   any indication as to where he was heading that
16   morning?
17   A.    No, and I did not ask.
18   Q.    So you don't know where he needed to be
19   or what time he needed to be there?
20   A.    No.
21   Q.    Okay.  Do you recall the police arriving
22   on the scene?
23   A.    Yes.
24   Q.    And did you speak with the police?
25   A.    I did.
```






137

```
 1   Q.    Did the police give you a police report
 2   when they were all done?
 3   A.    No.  He was a little bit short.  He
 4   didn't give me anything.  He didn't give me his
 5   name, badge number, anything like that.  He
 6   just took my report, and then that was it.
 7   Q.    Okay.  Were you given any citations?
 8   A.    No.
 9   Q.    Do you know if Mr. Perez was given any
10   citations?
11   A.    No.
12         MS. BENHAMOU:  No you don't
13   know, or no he wasn't?
14         THE WITNESS:  No, I don't know.
15         MS. BENHAMOU:  Sorry.
16   Q.    (By Ms. Eli) Kiara, are you familiar
17   with the police report that was created in this
18   case?
19   A.    No.
20   Q.    Okay.  I'm going to show you what has
21   been previously marked as Perez, or what has
22   been previously produced as Perez, underscore,
23   K&B, Pages 1 and 2.  It is a redacted version
24   of the Illinois Traffic Crash Report for you to
25   review.  It is two pages.  Will you just take a
```
Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com



138

```
 1   look at that, please.
 2   A.    (Witness complies.)
 3   Q.    And show plaintiff's counsel as well
 4   when you are done, please.
 5   A.    This (indicating) is a misspelling.
 6   Q.    What is misspelled?
 7   A.    My middle name.
 8   Q.    It starts with an "M," correct?
 9   A.    Right.  That is a letter extra.  Also,
10   the truck is wrong, the make of the truck.  It
11   says Mack.  I was driving a Freightliner
12   Cascadia.
13         MS. BENHAMOU:  A Freightliner
14   Cascade?
15         THE WITNESS:  Cascadia.
16         MS. BENHAMOU:  How do you spell
17   that?
18         THE WITNESS:  Freightliner?
19         MS. BENHAMOU:  No, Cascadia.
20         THE WITNESS:  C-A-S-C-I-D-A, I
21   think.
22         MS. BENHAMOU:  Thank you.
23         THE WITNESS:  So what is this?
24   Q.    (By Ms. Eli) I can't answer any
25   questions for you.  I just want you to review
```

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com



139

```
 1   it, and then we can go through it.
 2   A.    All right.
 3         MS. BENHAMOU:  We are the only
 4   ones that get to ask questions right now.
 5   Q.    (By Ms. Eli) Now, Kiara, when you look
 6   at the second page of the report, there is a
 7   map that appears to be drawn on the top
 8   portion, correct?
 9   A.    Correct.
10   Q.    Now, whether or not it is an accurate
11   map or not, I just want to go through the
12   description of this map before we discuss it.
13   How many lanes of traffic does that map depict?
14   A.    Four.
15   Q.    All right.  And is your truck depicted
16   in this picture?
17   A.    Yes.
18   Q.    And what is it referred to as?
19   A.    Is that a "D"?
20   Q.    You know what, it is too tiny to tell so
21   let's just ignore that.
22   A.    Okay.
23   Q.    Is this an accurate depiction of the
24   lanes of traffic wherein the accident occurred?
25   A.    No.
```

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com



140

```
 1   Q.    And why not?
 2   A.    Well, if this is to be believed, I would
 3   be in the cash lane at this point, and
 4   Mr. Perez would be in the right lane.  This
 5   would put me still legally but not in the right
 6   lane.
 7   Q.    Okay.  Were there four lanes of traffic
 8   in the portion that you and Mr. Perez were
 9   driving after you had gone through the toll?
10   A.    No.
11   Q.    How many actual lanes of operable
12   traffic were there in that area?
13   A.    I believe there was three.
14   Q.    There were three that whole time?
15   A.    No.  It started out as two.
16   Q.    Okay.  So I'm talking about when you
17   first went through the tollway.
18   A.    Okay, there was two.
19   Q.    There were two.
20         Okay.  Was there a shoulder lane on your
21   right side?
22   A.    Yes.
23   Q.    Was there also another shoulder on the
24   left if you would have seen it?
25   A.    Yes.
```

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com



141
1   Q.     So if you were to count the shoulders,
2   would then there have been four lanes?
3   A.     Yes.
4   Q.     Did you at any point prior to the impact
5   see Mr. Perez in that right-hand shoulder?
6   A.     You mean here (indicating)?
7   Q.     Well, I'm asking you, just in general,
8   did you ever see him in the right shoulder
9   prior to the impact?
10  A.     No.
11  Q.     Okay. Kiara, I'm going to show you the
12  exhibit that Mr. Perez created or from his
13  deposition that is Exhibit 1. Don't write or
14  anything on this, but I do want you to review
15  this image. Once you are done looking at it,
16  please show plaintiff's counsel, and then I'll
17  ask you questions about it.
18  A.     Okay.
19            MS. BENHAMOU: I can see, thank
20  you.
21  Q.     (By Ms. Eli) Kiara, is this a depiction
22  of that toll area with the four lanes of cash
23  on the right-hand side and the two lanes of the
24  open toll on the left-hand side?
25  A.     Yes.

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com


                                                            142
1   Q.     And had you gone through that open toll
2   that is on the right-hand side -- sorry, on the
3   left-hand side?
4   A.     Yes.
5   Q.     And that has the two lanes, correct?
6   A.     Correct.
7   Q.     Okay. Now, you indicated that when
8   Mr. Perez, the first spinout that he had, that
9   he ended up on the left-hand side of the two
10  lanes of traffic that were in that open tow
11  area, is that accurate?
12  A.     Yes.
13  Q.     That left-hand side, is it depicted on
14  this map and the scale of this map?
15  A.     No.
16  Q.     The point at which you would have made
17  impact with Mr. Perez, would that have been
18  then after that left-hand shoulder area that he
19  had been initially stopped at after his first
20  spinout?
21            MS. BENHAMOU: Objection to
22  form.
23  Q.     (By Ms. Eli) Kiara, when he -- sorry,
24  let's strike that.
25            Kiara, Mr. Perez after his first spinout

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com


                                                            143
1   ended up on the left-hand side of these two
2   lanes of traffic, correct?
3   A.     Correct.
4   Q.     The area in which he ended up, you
5   indicated that he stopped in that spot,
6   correct?
7   A.     Correct.
8   Q.     Did he come to a full stop?
9   A.     Yes.
10  Q.     And that area was on the left-hand side
11  of these two lanes of traffic, correct?
12  A.     Correct.
13  Q.     And that area from your recollection is
14  not depicted on this map, correct?
15  A.     Correct.
16  Q.     Would it have been further down the
17  road?
18  A.     Yes.
19  Q.     Okay. So outside the scope of this map,
20  correct?
21  A.     Correct.
22  Q.     If I were to -- strike that.
23            After you and Mr. Perez collided, did
24  his vehicle come at a rest that would have been
25  past that initial shoulder, left-shoulder stop

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com


                                                            144
1   that he had made, or did he go back closer to
2   the toll area?
3             MS. BENHAMOU: Objection: Form,
4   but keep going.
5   A.     Can you rephrase that?
6   Q.     (By Ms. Eli) Sure. Okay. So Mr. Perez
7   is stopped, correct?
8   A.     Right.
9   Q.     And you are traveling forward, correct?
10  A.     Right.
11  Q.     At some point he cuts back into traffic,
12  correct?
13  A.     Right.
14  Q.     And you make impact with him, correct?
15  A.     Right.
16  Q.     When his vehicle comes to a stop, does
17  he travel backwards, or does he travel forward?
18  Do you push him backwards, or do you push him
19  forwards?
20  A.     His vehicle ended up facing towards the
21  open toll.
22  Q.     Right. And how -- if you could estimate
23  how many feet he traveled then -- no strike
24  that. That is difficult to say as well.
25  A.     Yeah.

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com


1  Q.   Okay. Kiara, if I were to represent to
2  you that this "X" that is marked right here on
3  the map is where Mr. Perez estimated his car
4  came to a rest after you had collided with him,
5  would you agree with the "X" that he provided
6  on this map?
7  A.   No.
8  Q.   Why not?
9  A.   Well, he is too far, close to these
10 tolls here (indicating).
11 Q.   So he was farther down off the map?
12 A.   Yes.
13 Q.   That's all I needed.
14      MS. BENHAMOU:  Then for the
15 record, can we mark Kiara's drawing as Exhibit
16 2.
17      (Exhibit No. 2 was marked
18      for identification.)
19      (An off-the-record discussion
20      regarding exhibits took place
21      at this time.)
22 Q.   (By Ms. Eli) Now, Kiara, we heard the
23 testimony yesterday from one of the nighttime
24 supervisors that discussed that K & B has in
25 place a relay system, do you recall that?


1  A.   I'm very familiar with it, yes.
2  Q.   Okay. And in your description, in your
3  own words, what is the relay system that is
4  employed by K & B?
5  A.   Really depending on the situation, if
6  another truck had some type of mechanical
7  issues or if they were stuck at a shipper or a
8  receiver too long, and they didn't have no
9  hours, then somebody would be called. Or if
10 there is too many miles for when the load has
11 to be there, and you know you cannot drive it
12 legally, then somebody will be called. Like,
13 somebody will find another driver who can
14 complete that load for you. You will be asked
15 to either go to some type of destination --
16 like a Pilot or Flying J somewhere --
17 somewhere, and you will be asked to drive
18 whatever hours you have out left still legally,
19 and then you can switch the trailers. You will
20 either get another loaded trailer or an empty
21 trailer depending on whatever that trailer was
22 doing.
23 Q.   Okay. Now in your experience, is this
24 relay system readily available to all K & B
25 drivers?


1  A.   Yes.
2  Q.   Is it available if you are feeling too
3  ill or tired to complete a route?
4  A.   Yes.
5  Q.   Is it available if you encounter a
6  roadside accident or something that backs up
7  the time that you can complete a trip, is the
8  relay system available to you?
9  A.   Yeah. Anytime you cannot make it
10 legally and the load cannot get there on time,
11 as long as you contact your dispatcher and let
12 them know at the earliest convenience, you can
13 get a relay.
14      MS. ELI:  What was your
15 objection?
16      MS. BENHAMOU:  I'm fine.
17 Q.   (By Ms. Eli) Have you ever encounter a
18 situation at K & B in which a request for a
19 relay was denied?
20 A.   I don't think so.
21 Q.   Obviously --
22 A.   I mean, there was one point where I
23 might have -- they could not find a driver for
24 me, and they just rescheduled the load.
25 Q.   Okay.


1  A.   I mean, rescheduling is like the last
2  resort, but they will reschedule if they cannot
3  find a relay.
4  Q.   So if they cannot find a relay, you are
5  not then instructed that you are required to
6  complete the load, is that an accurate
7  statement?
8  A.   What do you mean required?
9  Q.   Well, if there is a reason why you
10 cannot complete the relay, whether you are
11 tired, you're sick, your hours are going to run
12 out --
13 A.   Okay.
14 Q.   -- is there anyone at K & B telling you,
15 well, you have to do it anyway?
16 A.   Illegally?
17 Q.   Yeah.
18 A.   Like out of hours, no.
19 Q.   In that same regard, have you ever been
20 threatened with termination if you are not able
21 to safely or legally complete a load?
22 A.   No.
23 Q.   Have you ever been threatened with a
24 dock in your pay for not being able to complete
25 a load on time?



Page 149

```
1   A.    No.
2   Q.    Have you ever been reprimanded in your
3   two years at K & B for not being able to
4   complete a load on time?
5   A.    No.
6         MS. BENHAMOU: I'm going to
7   object to the last three questions as she has
8   already testified she has never not completed a
9   load on time.
10  Q.    (By Ms. Eli) Have you ever been
11  reprimanded for requesting a relay that could
12  not be fulfilled?
13  A.    No. As I know my job, I know what I can
14  and cannot do. I'm always paying attention to
15  my miles and my time so if I know I cannot do
16  it and get it there on time, then I will call
17  my dispatcher and let them know before they
18  have to tell me, I need a relay, it is not
19  going to get there on time, and then they will
20  get me a relay.
21  Q.    Okay. Now, Kiara, we went through the
22  litany of your trip. I believe we came to a
23  conclusion based on your QTRACS that you left
24  Urbana at some point around 2:54 a.m. on
25  January 20, 2016, does that sound accurate to
```

Page 150

```
1   you?
2   A.    Yes.
3   Q.    Okay. And I think we also then looked
4   that your arrival time in Waterloo, Michigan
5   (sic) was scheduled for -- your delivery time
6   was scheduled for the following day on
7   January 21st at 4:00 a.m. eastern time?
8   A.    Newport, Michigan.
9   Q.    Newport, Michigan, sorry. Sorry, I did
10  write Waterloo right here. In Newport,
11  Michigan, that you had to be there on January
12  21st at 4:00 a.m. eastern, does that sound
13  familiar?
14  A.    Yes.
15  Q.    And we said 4:00 a.m. eastern is
16  3:00 a.m. central time?
17  A.    Correct.
18  Q.    So if you are leaving Urbana around
19  3:00 a.m. on the 20th, and you have to be in
20  Newport, Michigan at what would be 3:00 a.m.
21  central --
22  A.    Correct.
23  Q.    -- that is 24 hours, correct?
24  A.    Correct.
25  Q.    Kiara, when this accident occurred, do
```

Page 151

```
1   you know how many -- strike that.
2         This accident occurred at about 5:18 in
3   the morning, is that accurate?
4   A.    I don't really know the time.
5   Q.    Okay. All right. Kiara, I'm going to
6   show you a map that I printed off from Google
7   Maps, and we can mark this as our next exhibit.
8   I'll let you look at it first, and then show it
9   to counsel.
10        MS. BENHAMOU: Did we mark the
11  police report, Lamis, as Exhibit No. 3?
12        MS. ELI: We did not, but we
13  can. We will mark that as Exhibit No. 3.
14        MS. BENHAMOU: Police report No.
15  3, and this will be No. 4, the Google Maps.
16        MS. ELI: Yes.
17        (Exhibit Nos. 3 and 4 were
18        marked for identification.)
19  Q.    (By Ms. Eli) Did you take a look?
20  A.    Uh-huh.
21  Q.    That map depicts on it where Urbana,
22  Illinois would be located, is that accurate?
23  A.    Correct.
24  Q.    Does it also indicate on it where the
25  Meijer Center in New --
```

Page 152

```
1         MS. BENHAMOU: Newport.
2   Q.    (By Ms. Eli) -- Newport, Michigan would
3   have been as well?
4   A.    Correct.
5   Q.    And the route between Urbana and Newport
6   does that reflect the route that you would have
7   taken -- that you had intended to take for that
8   trip?
9   A.    Yeah, that looks acceptable.
10  Q.    Okay. If you flip to the next page.
11        All right. On Page 3 of this --
12        MS. BENHAMOU: Three of
13  Exhibit 4?
14        MS. ELI: Three of Exhibit 4.
15  Q.    (By Ms. Eli) It starts out with the
16  directions leaving Urbana, is that accurate?
17  A.    Yes.
18  Q.    And if it continues onto the next
19  page -- the next two pages -- does it give you
20  then what the directions correspond to from
21  that map to end at the Meijer Distribution
22  Center when compared to the map?
23  A.    Yes.
24  Q.    On the top of the map for the route that
25  is shown from Waterloo all the way to the
```






Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com

## Page 153

    1  Meijer Distribution Center, what is the total
    2  drive miles and hours that it estimates it
    3  would take?
    4  A.    It estimates 704 miles, 10 hours and
    5  48 minutes.
    6  Q.    Okay. Now, I'm sorry that the map is
    7  not on here for Urbana to the Meijer
    8  Distribution Center, but you can see that in
    9  the different segments of the map that it
   10  provides the time estimated for travel, is that
   11  accurate?
   12            (An off-the-record discussion
   13             between counsel occurred at
   14             this time.)
   15            MS. ELI: Sorry, you can strike
   16  my last question.
   17  Q.    (By Ms. Eli) Does it then show from
   18  Urbana all the way to the distribution center
   19  in different segments just how long the
   20  different segments would take, an estimate of
   21  time?
   22  A.    It is generally about, I go for 60 miles
   23  an hour.
   24  Q.    Okay.
   25  A.    So for me, this would have been three

## Page 154

    1  and a half, 3 hours and 42 minutes.
    2  Q.    For this 162 miles?
    3  A.    Right.
    4  Q.    Okay. So 162 miles you said, what,
    5  three and a half?
    6  A.    Three hours and 42 minutes. That is the
    7  way I would give myself time.
    8  Q.    Okay. And then if we look at the second
    9  segment, where it is about 24.6 miles, what
   10  would you estimate the time would have taken
   11  you to travel that distance?
   12  A.    Oh, probably half an hour.
   13  Q.    Half an hour. Okay. So what are we at
   14  total then?
   15  A.    3.42, half an hour, we are at 4 hours
   16  and 15 minutes.
   17  Q.    Okay. And then the next segment of it,
   18  the 191 miles, how long do you estimate it
   19  would take you to drive 191 miles?
   20  A.    It was like 3 hours and 11 minutes.
   21  Q.    Okay. So what would be a total from 4
   22  hours and 15 minutes?
   23  A.    That is 7 hours and -- what did I say --
   24  26 minutes, so almost seven and a half hours.
   25  Q.    So almost seven and a half hours to

## Page 155

    1  complete, you estimate, the trip from Urbana,
    2  Illinois to Newport, Michigan?
    3  A.    Yes.
    4  Q.    Okay. Now, we just indicated that you
    5  had 24 hours to complete that trip, is that
    6  accurate?
    7  A.    Yes.
    8  Q.    Did you at any point prior to this
    9  accident -- so going from Urbana to, you know,
   10  the few hours before this accident occurred,
   11  did you at any point have any reason to doubt
   12  your ability to make it on time for that
   13  4:00 a.m. January 21st delivery?
   14  A.    No.
   15  Q.    Did you at any point think that you
   16  would have to violate the rules for complying
   17  with your logs --
   18  A.    No.
   19  Q.    -- to complete that trip? No, okay.
   20       Now, Kiara, we went through the federal
   21  regulation that is there in front of you when
   22  plaintiffs' counsel was asking you questions.
   23  Now, when it comes to complying with that
   24  regulation regarding driving in any sort of
   25  hazardous weather condition, what is your

## Page 156

    1  understanding as to who makes the call as to
    2  whether or not there is a hazardous driving
    3  condition?
    4  A.    That would be me.
    5  Q.    Okay. And can you tell me the process
    6  that would go into that decisionmaking?
    7  A.    Visibility. If I can't -- so if I feel
    8  like I cannot stop, as further enough that I
    9  can see, like if I can only see 200 hundred
   10  miles -- or 200 feet, if I cannot stop then, if
   11  the conditions are really bad, like snowing
   12  heavily or if there is freezing rain, like it
   13  is just really, really bad, then I will call my
   14  -- well, I will stop first, and then call my
   15  dispatcher and tell him I am stopping.
   16  Q.    Have you ever been in a situation where
   17  you have had to stop due to hazardous driving
   18  conditions?
   19  A.    No. There has only been one time where
   20  I was told to stop, but there wasn't any
   21  hazardous conditions. It was just based off of
   22  this is coming, and I needed maintenance anyway
   23  so they just had me just stop.
   24  Q.    And was that decision made by K & B?
   25  A.    Uh-huh.






Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com

## Page 157

1  Q.  Yes?
2  A.  Yes.
3  Q.  Okay. So do you believe that on
4  January 20, 2016, when you were driving that
5  morning, that you were complying with this
6  federal regulation?
7  A.  Yes.
8  Q.  Okay. And could you estimate -- well,
9  first of all, was there snow, actual like snow
10 on the lanes of traffic that you were driving
11 in?
12 A.  No.
13 Q.  Was there snow on the shoulders at the
14 point that the accident occurred?
15 A.  Could have been, but I'm not for sure.
16 Q.  Okay. The ice that Mr. Perez hit --
17 scratch that.
18     You indicated that when you began to
19 slow down your vehicle, when you saw him spin
20 out --
21 A.  Right.
22 Q.  -- you started to feel a little bit of
23 the sliding --
24 A.  Yes.
25 Q.  -- on the road; is that correct?

## Page 158

1  A.  Correct.
2  Q.  Had you felt that at any point prior in
3  the couple of hours that you had been driving
4  from Urbana to that point?
5  A.  No.
6  Q.  Had you felt that, would you have
7  stopped, would you have made any concessions or
8  anything like that, or changed anything about
9  how you were driving?
10 A.  If I felt like my -- if I felt any type
11 of sliding or anything like that with my truck,
12 I would have slowed down a little bit more and
13 then tested it to see if it was just that
14 particular area that I just went through or if
15 it was just like I need to slow down period,
16 but I didn't feel anything.
17 Q.  And that accident that you indicated you
18 had seen a few miles up the road, do you have
19 any idea what the cause of that accident was?
20 A.  No. I came up to it when it was
21 already, you know, traffic was being diverted.
22 There was backed up traffic in the left two --
23 right two lanes.
24 Q.  Okay. Do you have any reason to suspect
25 that it was related to ice or snowy conditions

## Page 159

1  or anything like that?
2  A.  No. Honestly, we are getting towards
3  the Chicago area so.
4     MS. BENHAMOU: We are getting
5  towards the Chicago area so?
6     THE WITNESS: We were getting
7  towards the Chicago area so if there was an
8  accident, it was probably because somebody was
9  rushing or not paying attention to what they
10 were doing. I didn't have any reason to
11 believe it was ice.
12 Q.  (By Ms. Eli) Okay. Kiara, just to
13 confirm, you at no point during this entire
14 trip -- you know, strike that.
15     You indicated that you will put in the
16 coordinates or the destination on your Google
17 Maps on your phone, is that accurate?
18 A.  Yes.
19 Q.  And at what point do you do that?
20 A.  Generally at the beginning or sometimes
21 I'm stopped and I don't really know what is
22 going on, I might look at Google Maps, but it
23 is not always.
24 Q.  Okay. So is it fair to say that if you
25 had put in the coordinates on your phone that

## Page 160

1  day, you would have done so prior to departing
2  from Urbana?
3  A.  Yes.
4  Q.  Between your departure or putting the
5  coordinates into your phone and this accident,
6  did you at any point have your cell phone in
7  use?
8  A.  No.
9  Q.  And just to confirm, do you wear like a
10 hands-free set or anything like that with your
11 cell phone?
12    MS. BENHAMOU: Objection. Asked
13 and answered.
14 Q.  (By Ms. Eli) Go ahead.
15 A.  No.
16 Q.  So if somebody is trying to call you on
17 your cell phone while you are driving --
18 A.  I have an auxiliary cord so everything
19 goes through the speakers of the entire truck.
20 Q.  So if someone is calling you, you know
21 that someone is calling you?
22 A.  Yes, from the speakers. Yeah.
23 Q.  And are you able to answer it, or do you
24 -- do you answer it?
25 A.  Sometimes. It just depends on who. If

1  it is my sister, yes, and then I will speak to
2  her through the truck. I don't hold it in my
3  hands.
4  Q.     It is a completely hands-free system?
5  A.     Yes.
6  Q.     At the time that the accident occurred,
7  were you speaking on your cell phone?
8  A.     No.
9  Q.     Were you texting on your cell phone?
10 A.     No.
11 Q.     Were you checking your cell phone for
12 coordinates?
13 A.     No. I didn't have Google Maps up at
14 that time.
15 Q.     Were you checking your phone for any
16 weather issues?
17 A.     No.
18 Q.     Were you checking your phone for any
19 traffic issues?
20 A.     No.
21 Q.     Is it safe to say you were not using
22 your phone at the time this accident occurred?
23 A.     Yes.
24 Q.     Now I believe you testified earlier that
25 you recall there being a drop in the speed

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com

1  limit at some point prior to where this
2  accident occurred, is that accurate?
3  A.     Correct, five miles.
4  Q.     While you were driving and this pickup
5  truck was next to you on your left-hand side,
6  were you all driving at a comparable speed with
7  one another?
8  A.     After I started really slowing down?
9  Q.     No. Prior to when you see Mr. Perez
10 spinning out, you and the pickup truck, were
11 you all driving at the same speed, was he
12 driving faster than you?
13 A.     He was driving slightly faster than me.
14 Q.     So you were not passing him at any
15 point?
16 A.     No.
17 Q.     Are you able to make any estimate as to
18 what your speed was prior to seeing Mr. Perez
19 spin out?
20 A.     No.
21 Q.     Would you have been operating your
22 vehicle at a greater speed than what the posted
23 speed limit would have been?
24 A.     No, I cannot.
25 Q.     What do you mean you cannot?

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com

1  A.     Our trucks are governed. At that
2  particular time, my truck was governed at 64 so
3  it is not possible for me to go above -- well,
4  I could, but -- so I guess, yeah, if I wanted
5  to, I could since it was 55.
6  Q.     So you know that the speed limit there
7  is 55?
8  A.     Yes.
9  Q.     Okay. And your truck at that point,
10 then, is able to operate up to 64 miles an
11 hour?
12 A.     Yes.
13 Q.     Do you believe that you were operating
14 at 64 miles an hour at that point?
15 A.     No.
16 Q.     Do you think you were operating at
17 60 miles an hour at that point?
18 A.     No.
19 Q.     What about 55?
20 A.     I'm not for sure, but I know I wasn't
21 going faster than 60.
22 Q.     When you first saw Mr. Perez's vehicle
23 spin out that first time, do you have any way
24 to estimate how far away he was from you
25 distance-wise?

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com

1  A.     At the very least, at least eight
2  seconds.
3  Q.     Okay.
4  A.     So there was about a trucks' length
5  worth of space in-between us.
6  Q.     Well, you indicated to me earlier that
7  it took you four rounds of braking and letting
8  go to catch up to where he was. So do you
9  think it was more than eight seconds?
10 A.     It was definitely more than eight, but I
11 can say for sure I gave him the standard eight
12 seconds of space.
13 Q.     Before he spun out --
14 A.     Right.
15 Q.     -- do you have any estimate as to what
16 his traveling speed was?
17 A.     I think he was going slower than 55.
18 Q.     Did he appear -- were you keeping the
19 same distance between the two of you? Do you
20 think he was going the same speed as you,
21 faster than you, slower than you?
22 A.     In order for me to have caught up with
23 him at that particular speed, he was going
24 slower than me.
25 Q.     Okay. Kiara, I just want to confirm,

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com

Page 165

```
 1   have you ever experienced a situation at K & B
 2   where you were encouraged or required to
 3   violate any of the federal rules that cover
 4   commercial vehicles?
 5   A.      No.
 6   Q.      Has K & B ever required of you to
 7   operate your vehicle at a speed that is higher
 8   than what is permitted in any jurisdiction?
 9   A.      No. It is always at or below.
10   Q.      Have they ever required you to drive one
11   of their motor vehicles in a manner that
12   exceeds the maximum driving time that is
13   federally permitted?
14   A.      No.
15   Q.      Have they ever required you to drive
16   your motor vehicle in any hazardous conditions?
17   A.      Forced?
18   Q.      Yeah.
19   A.      No.
20   Q.      Kiara, I want to go through just to
21   clarify something in your cell phone records
22   and compare it as well to your driver logs, but
23   I need to get all of that out. So just give me
24   a second.
25           I'll go off the record while I pull
```

Page 166

```
 1   those out.
 2                MS. BENHAMOU: Okay.
 3                MS. ELI: We can go back on the
 4   record.
 5   Q.      (By Ms. Eli) Kiara, I want you to look
 6   for January 20th. I know we kind of went
 7   through this -- between this as well as the
 8   QTRACS -- as to when you believe you arrived in
 9   Urbana and what, do you recall that?
10   A.      Yes.
11   Q.      Now, from the QTRACS -- I don't want to
12   take a lot of time. Can I see that, Kiara?
13           Okay. Kiara, I want you to take a look
14   at one that you previously seen as Page 216
15   from those QTRACS, was that one your arrival
16   time as to when you got to Urbana?
17   A.      Yes.
18   Q.      And what time is listed on there?
19   A.      2:01 a.m.
20   Q.      Can you just describe to me the general
21   process when you get to a certain center, is it
22   clearly marked where you need to go or where
23   you need to be, or does it require some
24   figuring out with an area?
25   A.      Generally, the first place you go is you
```

Page 167

```
 1   have to check in with a guard, and if I've
 2   never been there before, I would ask. Some
 3   places if there isn't a guard, there are signs
 4   that direct you. You need to either use your
 5   -- I can't even think of what it is called
 6   right now -- or you call on the phone. They
 7   give you a number, and then you check in that
 8   way.
 9   Q.      Okay. So once you get to an area and
10   you've gone through that gate --
11   A.      Right.
12   Q.      -- is it common then at that point, you
13   would have reason to, you know, use a telephone
14   either with regard to exactly where you are
15   going or to which area of the property you need
16   to go to?
17   A.      If there isn't a guard and there is no
18   clearly marked signs for me, I will call
19   shipping and receiving.
20   Q.      And will you still be in your vehicle
21   when this occurs?
22   A.      Yes.
23   Q.      And do you stop your vehicle when this
24   occurs?
25   A.      Yes.
```

Page 168

```
 1   Q.      Okay. Kiara, I wanted to show you
 2   really quickly, these were the phone records
 3   that you provided to us that we produced in
 4   discovery. I'm referring to K & B page --
 5   Perez, underscore, K&B, Page 383. Kiara, if
 6   you look at the top left-hand side of this, is
 7   that your cell phone number?
 8   A.      Yes.
 9   Q.      And does this appear to be call logs
10   that begin on January 19, 2016?
11   A.      Yes.
12   Q.      And with respect to the times that are
13   indicated, can you read this line for me?
14   A.      Date and time.
15   Q.      Keep going.
16   A.      Number, description.
17   Q.      No, sorry. Sorry. This actual sentence
18   that is up here (indicating).
19   A.      Oh, the date and time corresponds to the
20   local time where the mobile was located.
21   Q.      Okay. So for instance, if we are
22   looking at the very first entry from
23   January 19, 2016, at 7:42 a.m., that is central
24   time, correct?
25   A.      Correct.
```

*Angela M. Ickler, RPR*
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com






169

Page 169:

Q. Because you were in Illinois at that point?
A. Correct.
Q. Okay. But if you look down just a few rows, now the QTRACS that we looked at indicated you arrived at the site at Urbana at 2:01 a.m. on the 19th; is that correct?
A. Correct.
Q. And that is central time, correct?
A. Correct.
Q. And that is the time zone that you were in, correct?
A. Correct.
Q. Okay. So if we look at January 20, 2016, the first two entries, there is an entry at 2:08 a.m. and 2:11 a.m., is that accurate?
A. Yes.
Q. Again, those are central time, correct?
A. Right.
Q. And there are two calls to the same phone number, correct?
A. Correct.
Q. A 217 number; is that correct?
A. Correct.
Q. And the description of it, what does

Page 170:

that indicate in that?
A. It looks like to Champaign/Urbana, Illinois.
Q. And it says that for both of them, correct?
A. Correct.
Q. And were these calls that were placed?
A. Yes.
Q. Now, would these have been calls that were placed after you had arrived at the station in Urbana?
A. Yes.
Q. And this is before you had left Urbana, correct, because I think we determined that you didn't leave until almost 3:00 a.m.?
A. Correct.
Q. Okay. Would these have been calls that you made to someone there in Urbana?
A. Yes.
Q. All right. Okay. Kiara, if I direct your attention to QTRACS Page 231, this is a page we previously discussed, correct?
A. Right.
Q. And in it, does it give you any information -- well, what does this one -- this




Page 171:

QTRACS show you in 231?
A. It tells me about my additional stop here at the Super Value, the address, phone number, the Bill of Lading, and the delivery times.
Q. And why are you given a phone number in there?
A. Just in case I need to contact somebody with questions, or if I need a little bit more information about directions.
Q. Okay. And that is a 217 number, correct?
A. Correct.
Q. All right. Now, Kiara, then when you got to that port in Urbana and you called those two telephone numbers, do you have any idea who the recipient of those two phone calls were?
A. I would have to say Super Value.
Q. And what makes you say that?
A. They have the same area code and the same first numbers.
Q. And why would you have been calling them, if you can recall?
A. If I was calling them because the numbers are slightly different, I would have to

Page 172:

say that there was a sign that said I needed to call to check in.
Q. Okay.
A. After I've gotten to a staging area.
Q. If I were to represent to you when I call that number, a receiving area dispatcher from -- at that Super Value in Urbana picks up, do you have any reason to disagree with that?
A. No.
Q. Like if I were to pick up the phone and call that, that is who would answer right now?
A. Yes.
Q. The phone calls that you made at that point, are they in violation of anything that K & B has trained you with respect to what you do when you arrive at a destination?
A. No.
Q. You are permitted to make those phone calls, correct?
A. Yeah.
Q. You are legally permitted to make those phone calls?
A. Yes, especially since I'm on the property, and I'm not like driving driving.
Q. Okay. Kiara, who conducts your reviews




Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com

43 of 68 sheets    Page 169 to 172 of 193    06/13/2018 11:22:42 AM

Page 173

```
1   at K & B?
2   A.      Probably safety.
3   Q.      Do you know how often they review you at
4   K & B through safety?
5   A.      I know at least once a year.
6   Q.      Okay.  Have you ever in your time at
7   K & B had any citations or any issues with
8   your reviews through safety?
9   A.      No.  They have always been just like,
10  sign here, you are okay.
11  Q.      Got it.  Following this accident that
12  occurred, I just want to go through your
13  reporting procedures to K & B.  Are you -- as
14  part of your job description, are you required
15  to report an accident to K & B?
16  A.      Yes.
17  Q.      And what is that protocol?
18  A.      Generally K & B protocol is I'm supposed
19  to call -- once I'm, you know, in the safe
20  area, call 911 first, and then you call K & B,
21  but I called K & B first and then 911.
22  Q.      But you did call K & B as required?
23  A.      Yes.
24  Q.      Okay.  Do you recall who you spoke with
25  when you first called K & B?
```



Page 174

```
1   A.      Safety.
2   Q.      And do you know who at safety?
3   A.      No.
4   Q.      Okay.  Did you at some point speak with
5   Matt Tipton?
6   A.      I can't say.
7   Q.      Okay.  We talked about you were shown
8   previously the two-strikes rule at K & B, do
9   you recall that?
10  A.      Yes.
11  Q.      And that, you know, if there are two
12  strikes against a critical -- or if there is
13  two strikes against you related to delivering a
14  critical customers' freight, it counts as a
15  strike against your record, is that proper?
16          MS. BENHAMOU:  Objection.
17  Misstates the record.
18  A.      I've not ever had that apply to me.
19  Q.      (By Ms. Eli) Do you know -- without
20  looking at what the actual paperwork says, what
21  are instances that would subject a driver to a
22  reprimand under the two-strike policy?
23          MS. BENHAMOU:  Objection.  Asked
24  and answered.
25  A.      Such as if they arrived late.  I mean,
```



Page 175

```
1   like what do you mean?
2   Q.      (By Ms. Eli)  I mean, what is your
3   understanding as to how someone can violate the
4   two-strike rule?  I'm not saying you violated
5   it.
6   A.      Right.
7   Q.      What do you as a driver have to do to
8   not violate that two-strike rule?
9   A.      You would have to arrive late under your
10  own power.  Like, if you chose to stop
11  somewhere for longer than you were supposed to,
12  or if you overslept, you take a nap or you
13  overslept, you just decided -- or you showed up
14  at the wrong place, you know, just anything
15  that is out of your control -- or that is under
16  your control and you still showed up late, then
17  that would be a problem.
18  Q.      Okay.  Kiara, what if you are involved
19  in a preventable accident, would that subject
20  you to any strike under that rule?
21  A.      I'm not for sure.
22  Q.      Okay.  What if you have a moving
23  violation such as speeding?
24  A.      Okay.  Then yeah, I think you would be
25  at fault for that.
```



Page 176

```
1   Q.      You would be at fault for that and would
2   you be subject to possibly the two-strike rule?
3   A.      Possibly.
4   Q.      But, again, you don't know because you
5   are not the one who is enforcing it?
6   A.      Correct.
7   Q.      Following this accident with Mr. Perez,
8   what was your -- strike that.
9           Following this accident and your
10  reporting with K & B, was there ever a
11  discussion with respect to fault as to what
12  occurred with the accident?
13  A.      I don't think so.  I probably just told
14  them, he spun out in front of me.
15  Q.      Okay.  So -- but you did tell them that
16  that's how the accident occurred, correct?
17  A.      And I might have just shared that the
18  police officer didn't find me at fault, and he
19  didn't give me a ticket or anything so I don't
20  know if I was asked.
21  Q.      Okay.  So do you know, then, if K & B
22  had to do any sort of investigation or anything
23  like that, beyond that, as to how you told them
24  the accident occurred?
25  A.      Probably.
```



```
                                                         177
 1    Q.    Has anyone at K & B ever reported to you
 2    or come back to you and said that this was an
 3    accident that was your fault?
 4    A.    No.
 5    Q.    From your understanding, K & B
 6    classifies this as a non-preventable accident
 7    for you, correct?
 8    A.    Correct.
 9    Q.    And they do not hold you at fault?
10    A.    Correct.
11    Q.    They hold Mr. Perez at fault?
12    A.    Correct.
13              MS. BENHAMOU:  Objection.
14    Foundation, but go ahead.  You said correct.
15    You are fast.
16    Q.    (By Ms. Eli)  Kiara, if you had to
17    describe the reputation of K & B with respect
18    to safety for drivers, how would you describe
19    it?
20    A.    Call it drill safety.  They push safety
21    a lot.  For the -- be safe.  Wear your
22    seatbelt.  Drive at or below speed limit.  Stay
23    in the right lane.  Don't be getting over.
24    Watch your mirrors.  Pay attention to the
25    people that are around you.  Stay away from the
```

```
                                                         178
 1    shoulder.  Do not park at the entry and exit
 2    ways.  It is a lot.
 3    Q.    So safety for the drivers is hammered to
 4    you guys?
 5    A.    Yes.  You could kill somebody.
 6    Q.    Right.  We went through the QTRACS.  You
 7    get multiple messages a day.  Do you get safety
 8    reminders on those QTRACS?
 9    A.    They are in the daily messages we get.
10    Every Monday, we get safety messages, and after
11    every message that recaps whatever we have
12    talked about with my dispatcher, it is always
13    drive safe.  Deliver on time.
14    Q.    With respect to the safety of the other
15    people on the road, you know other drivers,
16    construction crews, anything like that that
17    might happen, how would you describe K & B's
18    reputation?
19    A.    Pay attention.  Slow down.  Give more
20    following distance.  Move over.  You know,
21    drive at or below speed limit.
22    Q.    So would you agree with me that K & B
23    does have a policy of insuring safety --
24    A.    Everybody.
25    Q.    -- including the drivers, the other
```

```
                                                         179
 1    drivers on the road?
 2    A.    Yes.
 3    Q.    Kiara, I want to ask you about, now you
 4    said that there was daily morning messages that
 5    are sent out regarding weather, is that an
 6    accurate statement?
 7    A.    Yes.
 8    Q.    And are those messages that are sent
 9    from like a national weather service, or are
10    they sent by someone at K & B?
11    A.    Someone at K & B.
12    Q.    And he does this everyday?
13    A.    Everyday except Sundays.
14    Q.    Except Sundays.  Do you know the name of
15    the man that does it?
16    A.    It always says Mike R.
17    Q.    And Mike R. is?
18    A.    I have no idea.
19    Q.    Okay.  But he is the one that sends them
20    everyday, correct?
21    A.    Yes.
22    Q.    Do his messages -- are they limited to a
23    certain part of the United States --
24    A.    All over.
25    Q.    -- or do they just generally cover --
```

```
                                                         180
 1    hang on.  Make sure we get it clean on the
 2    record.
 3              Is it to a specific area, or is it to
 4    all over the United States?
 5    A.    All over.
 6    Q.    Because there is K & B drivers all over
 7    the U.S.?
 8    A.    Correct.
 9    Q.    So even if it were to mention anything
10    related to the weather conditions or the
11    temperatures in your region, it is not going to
12    give a comprehensive analysis of what is going
13    on specifically in your region?
14    A.    No.  It is generally, basically, high
15    points.  Like if there is, you know, really bad
16    snow in the northwestern part, then it will
17    tell you there is sunshine down south, and
18    there is rain in the Midwest.
19    Q.    So if you need to figure out, you know,
20    what the driving conditions or the weather
21    conditions are in the specific area, you are
22    going to be -- you are relying on external
23    weather reports, whether it is checking on your
24    phone or the radio or anything like that when
25    you are stopped, is that accurate?
```

1 A. For me specifically?
2 Q. Yes.
3 A. I generally go by what the Qualcomm
4 says, and I can just figure out on my own
5 because, you know, the weather isn't that
6 different between state to state. So if they
7 said that there is a snowstorm from Nebraska to
8 Iowa, well, then I know, and it is like really
9 sunny now, I know it is going to come behind
10 me. I just use a little common sense.
11 Q. Okay. So if you got a message saying
12 that there was light snow in an area, you can
13 use that maybe to determine whether or not it
14 is going to affect where you are driving?
15 A. Yes.
16 Q. But that is not determinative, correct?
17 A. Correct. There was a time where there
18 was supposed to be a really bad snowstorm
19 between Nebraska and Iowa. I was not -- I knew
20 it was behind me. I knew it was coming, but I
21 never experienced it because I was in front of
22 it, and I never saw anything while I was in
23 Wisconsin. So I know it is there, and if I
24 have to go back that direction, I know it is
25 there.

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com


1 Q. So safe to say that whatever is going to
2 happen with the weather, you are in the best
3 position to know where you are driving and what
4 the conditions are going to be?
5 A. Everyday. If there is a really bad
6 storm, we get multiple weather alerts
7 throughout the day. So for that particular
8 storm I'm speaking of, I had multiple weather
9 alerts.
10 Q. Do you know what time Mike R., does he
11 generally send his messages on a particular
12 time of day?
13 A. Between 5:45 and 6:00 a.m.
14 Q. And if I were to represent to you that
15 this accident occurred at 5:18 a.m., would you
16 have gotten a message yet from him that
17 morning?
18 A. No. Yesterday's would have been applied
19 until he sent a new one.
20 Q. So you would have relied on the one from
21 the 19th?
22 A. Right.
23 Q. Okay. Kiara, was it still dark out when
24 the accident occurred?
25 MS. BENHAMOU: Objection. Asked

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com


1 and answered.
2 A. Yes.
3 Q. (By Ms. Eli) Do you recall when the sun
4 came up that morning?
5 A. No. I mean, not really. Timewise, no.
6 Q. Kiara, have you ever had to make a
7 complaint at K & B about any of the dispatchers
8 and the requirements that they have set on you?
9 A. No.
10 Q. Kiara, the orientation and the training
11 process at K & B, do you recall how long the
12 orientation itself took?
13 A. I think maybe three days.
14 Q. Okay. And then how long until you were
15 permitted to drive on your own?
16 A. I think maybe that third day I was
17 assigned a truck, and I think that maybe that
18 night or that very early next morning, I was
19 given my first load.
20 Q. Okay. Kiara, you may have been asked
21 this before and I apologize, you don't know
22 what happened to the freight that you were
23 hauling after it got took, correct?
24 A. Correct.
25 Q. K & B stresses that things be delivered

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com


1 on time, is that an accurate statement?
2 A. True, but it is also an industry
3 standard.
4 Q. Industry standard, okay. Why is that an
5 industry standard?
6 A. There are so many distribution centers,
7 everything needs to come in a timely manner.
8 They cannot just have multiple trucks arriving
9 late. You know, that slows down production.
10 So everybody has an appointment. You need to
11 show up. Some places are okay with earlier
12 than the hour, but generally it is an hour or
13 less.
14 Q. So aside from it being an industry
15 standard, why do you believe that on-time
16 deliveries are also a K & B standard?
17 A. Well, it also costs money if you are
18 late. You could if you have a culture of
19 constantly having late delivers, then you could
20 lose your customer.
21 Q. Kiara, just to confirm, have you ever
22 met -- obviously, you met Mr. Perez at the time
23 of the accident. Did you ever meet his spouse,
24 Dee Perez?
25 A. I didn't know he was married, no.

Angela M. Ickler, RPR
Latimer Reporting *402-476-1153* latimer@latimer-reporting.com


185

```
 1              MS. ELI:  Okay.  I think that is
 2   all that I have at this point.  I'll hand you
 3   back to Hadas.
 4              MS. BENHAMOU:  Sure.  So I would
 5   like to mark your cell phone records.  I
 6   believe we are on four --
 7              THE COURT REPORTER:  Five.
 8              MS. BENHAMOU:  Five, thank you.
 9   As Exhibit 5, please, and, Kiara --
10              MS. ELI:  Just make sure that
11   there are all of them, just whichever ones you
12   want.  I just don't know if I gave you guys all
13   of the pages because my stuff is kind of mixed
14   up.  But I have no problem, like, with
15   supplementing it or from what we have in
16   discovery.
17              MS. BENHAMOU:  I think you gave
18   her all and more.  So here is that.
19              (Exhibit No. 5 was marked
20               for identification.)
21              MS. BENHAMOU:  Perfect.
22                  REDIRECT EXAMINATION
23   BY MS. BENHAMOU:
24   Q.    I want to go back to Page 383, which we
25   looked at, and it documents your talk time; is
```

186

```
 1   that correct?  Unless you don't know what I
 2   mean by talk time, and I can clarify that.
 3   A.    You mean like minutes?
 4   Q.    No, I mean times you were actually
 5   either receiving calls or making calls, fair?
 6   A.    Yes.
 7   Q.    So on Page 383, I want to take you to
 8   January 20, 2016, at 5:19 a.m., okay.  Do you
 9   see where that is?
10   A.    Right.
11   Q.    And would you agree that the number next
12   to the time stamp is a K & B number?
13   A.    It could be.
14   Q.    If I show you Answers to Supplemental
15   Discovery the plaintiff submitted to defense
16   and defense answered on February 12, 2018, we
17   received responses to discovery which
18   identified that number that you called at
19   1/20/2016 at 5:19 a.m. and the number is
20   866-414-4280 --
21   A.    It was just K & B main switchboard.
22              THE COURT REPORTER:  I'm sorry,
23   I can't hear the witness.
24              THE WITNESS:  It was just the K
25   & B main switchboard.  At least that's what it
```

187

```
 1   says on the piece of paper.
 2   Q.    (By Ms. Benhamou)  And do you have any
 3   reason to dispute that that number I just read
 4   off is the K & B switchboard?
 5   A.    No.
 6   Q.    Does it make sense to you since you've
 7   already testified that you first called K & B,
 8   and then you called 911, does it make sense
 9   that in the order reflected on your Team Mobile
10   records shows that you first called K & B at
11   5:19, and then you called 911 at 5:23?
12   A.    Correct.
13   Q.    And that is accurate, yes?
14   A.    Yes.
15   Q.    Okay.  Great.  And then just for
16   clarity, we discussed how the number reflected
17   in the QTRACS is not the exact same number as
18   this 217 number on the Team Mobile records.
19   Could you do me a favor and read for me the
20   actual number on the QTRACS records, which is
21   Page 231.
22   A.    It is area code 217-384-2771.
23   Q.    Great.  And can you read for me the
24   number that you actually called based on your
25   Team Mobile records, which is Bates stamped
```

188

```
 1   383?
 2   A.    It is area code 217-384-2733.
 3   Q.    Okay.  All right.  Now, we can move away
 4   from your cell phone records, and I want to ask
 5   you in the moments before the collision
 6   actually occurred, you said that you made eye
 7   contact with Mr. Perez, correct?
 8   A.    Correct.
 9   Q.    And you were able to tell that he had
10   come to a complete stop all the way on the left
11   -- the left, not median, the left --
12   A.    -- shoulder.
13   Q.    Yes, thank you.  The left shoulder, that
14   is correct?
15   A.    Correct.
16   Q.    And you were able to make eye contact
17   with him and appreciate that he came to a full
18   stop while performing your brake procedure?
19   A.    At this point, once he came to a
20   complete stop, I stopped.  I didn't feel like
21   there was a need to continue because he
22   stopped.
23   Q.    Got it.
24   A.    So I felt like we were all good.
25   Q.    So the truck next to you in the left
```

Page 189

1  lane had stopped driving?
2  A.  No.  He stopped the weird swerving.
3  Q.  So he continued to drive?
4  A.  Yes.  He just kept pace with me at this
5  point.
6  Q.  Got it.  And Mr. Perez is stopped in the
7  left --
8  A.  -- shoulder.
9  Q.  -- shoulder, thank you.  Stopped on the
10 left shoulder, and now you are no longer doing
11 your braking situation?
12 A.  Right.
13 Q.  And are you accelerating at this point?
14 A.  No.  My foot stayed off the gas pedal.
15 Q.  Okay.  But it is not on the brake pedal
16 either?
17 A.  Right.  I'm just letting the truck slow
18 down on its own.
19 Q.  Got it.  Got it.
20     Okay.  And the reason that you stopped
21 putting pressure on the brake pedal was because
22 like you said, you thought he had stopped and
23 got out of the way?
24 A.  Yes.  It is not safe to stop in a road.
25 Q.  Right.



Page 190

1      Kiara, you are still employed by K & B
2  today, correct?
3  A.  Right.
4  Q.  And you like working for K & B, correct?
5  A.  Correct.
6  Q.  You are satisfied with your pay rate?
7  A.  Yes.
8  Q.  And you are not currently seeking new
9  employment; is that correct?
10 A.  Correct.
11 Q.  Okay.  And then finally your speed you
12 mentioned is governed at 64 miles per hour?
13 A.  Correct.
14 Q.  By "governed," it means that you cannot
15 go above 64 miles per hour?
16 A.  Correct.  It doesn't matter pedal or
17 cruise control.
18 Q.  And it doesn't matter if you are on a
19 hill, going down a hill?
20 A.  That is different.
21 Q.  Tell me what happens when you go down a
22 hill?
23 A.  If you do not apply the brakes and keep
24 your truck slowed down, it doesn't matter if
25 you are governed or free to go whatever speed



Page 191

1  you like, you will pick up speed.
2  Q.  And accelerate over the governed speed?
3  A.  Yes.
4  Q.  But you would always put on the brakes
5  when you are going down the hill, correct?
6  A.  Or the engine brake.
7  Q.  Okay.  Got it.  So you take measures to
8  precaution against potentially going over the
9  governed speed, even if your vehicle was to go
10 over the governed speed?
11 A.  Correct.
12     MS. BENHAMOU:  Fantastic.  I am
13 all set.
14     MS. ELI:  Let's take a
15 five-minute break.  I just want to make sure I
16 have everything, and then we can conclude.
17     (A brief recess was taken
18     at this point in time.)
19     MS. ELI:  We can go back on the
20 record.
21         RECROSS-EXAMINATION
22 BY MS. ELI:
23 Q.  All right.  Kiara, just to confirm,
24 you've never had your license revoked, is that
25 accurate?



Page 192

1  A.  Correct.
2  Q.  And you've never had your license
3  suspended, is that accurate?
4  A.  Correct.
5      MS. ELI:  All right.  Those are
6  the only questions I have for you.
7      MS. BENHAMOU:  I have nothing
8  further.  Thank you.
9      MS. ELI:  All right.  So, Kiara,
10 the same thing like we said yesterday with
11 Chris, you can waive your signature.  I'll look
12 through it to make sure everything is spelled
13 correctly and properly, and that is for our own
14 purposes, but you can't change any of your
15 questions -- or any of the answers, is that
16 okay to waive signature?
17     THE WITNESS:  That's fine.
18     (At 12:25 p.m. the deposition concluded.)



```
 1                C-E-R-T-I-F-I-C-A-T-E
 2
    STATE OF NEBRASKA    )
 3                       :  ss.
    COUNTY OF SAUNDERS   )
 4
 5        I, Angela M. Ickler, General Notary
 6  Public in and for the State of Nebraska, do
 7  hereby certify that KIARA WHARTON was by me
 8  duly sworn to testify the truth, the whole
 9  truth and nothing but the truth, and that the
10  deposition by her as above set forth was
11  reduced to writing by me.
12        That the within and foregoing deposition
13  was taken by me at the time and place herein
14  specified and in accordance with the within
15  stipulations; the reading and signing of the
16  witness to her deposition having been waived.
17        That I am not counsel, attorney, or
18  relative of either party or otherwise
19  interested in the event of this suit.
20        IN TESTIMONY WHEREOF, I have placed my
21  hand and notarial seal the 9th day of April,
22  2018.
23                    _____
                         Angela M. Ickler, RPR
24
25
```

*Angela M. Ickler, RPR*
*Latimer Reporting ·402-476-1153· latimer@latimer-reporting.com*